# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3327

_____

United States of America,

*Plaintiff - Appellee,*

v.

Dana Enoch Kidd, Jr.,

*Defendant - Appellant.*

_____

No. 18-3328

_____

United States of America,

*Plaintiff - Appellee,*

v.

Adam John Burke,

*Defendant - Appellant.*

_____

No. 18-3558

_____

United States of America,

*Plaintiff - Appellee,*

v.

Abdirahin Khalif Ibrahim,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: October 17, 2019
Filed: June 26, 2020

_____

Before COLLOTON, WOLLMAN, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Adam Burke, Abdirahin Ibrahim, and Dana Kidd of mail fraud and conspiracy to commit mail fraud. *See* 18 U.S.C. §§ 1341, 1349. The defendants appeal their convictions and sentences on various grounds. We conclude that there was no reversible error and affirm the judgments of the district court.[1]

I.

Adam Burke was a licensed chiropractor who operated Burke Chiropractic in Edina, Minnesota. Between 2012 and 2015, Burke's business model centered on treating patients involved in automobile accidents. Patients needing treatment

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

-2-

qualified for mandatory insurance coverage under Minnesota's No-Fault Insurance Act. The Act requires automobile insurers to pay for up to $20,000 in qualifying medical expenses, including chiropractic treatment, after an automobile accident, regardless of fault. Minn. Stat. § 65B.44, subdiv. 1 and 2. The Act allowed Burke to bill insurance companies directly and to receive reimbursement for qualifying treatment that he provided to patients. *Id*., subdiv. 1(a).

Minnesota law regulates how health care providers may solicit patients. It is a felony for a health care provider to employ a "runner" to procure or solicit patients. Minn. Stat. § 609.612, subdiv. 2. A runner "procures or solicits prospective patients through telephonic, electronic, or written communication, or in-person contact" on behalf of a health care provider "when the person knows or has reason to know that the provider's purpose is to perform or obtain services or benefits under or relating to a contract of motor vehicle insurance." *Id.*, subdiv. 1(c). The statute provides that "[c]harges for any services rendered by a health care provider, who violated this section in regard to the person for whom such services were rendered, are noncompensable and unenforceable as a matter of law." *Id*., subdiv. 2. The No-Fault Insurance Act also defines the use of a runner as an unethical practice. Minn. Stat. § 65B.54, subdiv. 6(a).

According to evidence at trial, Burke nonetheless employed several runners, including Ibrahim, Kidd, and Samatar Omar. Burke paid his runners to solicit people involved in automobile accidents and to ensure that patients returned for each appointment in the prescribed treatment plan. The runners often promised to pay the prospective patients. If a patient missed an appointment, Burke expected the runner to prod the patient to return for further treatment, or to recruit a new patient without additional payment from Burke.

Burke compensated his runners per patient after each patient attended a threshold number of appointments. The runners used these disbursements to pay

patients; they also collected their own "consulting fee" from Burke. Between 2012 and 2015, Burke paid Ibrahim over $200,000 and Kidd over $90,000 for their services as runners.

Burke's business model relied on billing insurance companies for as many treatments as possible under the No-Fault Insurance Act. Burke usually recommended the same treatment plan for automobile accident patients—two to three appointments per week and a total of thirty to forty appointments. Burke coached runners to tell patients to schedule fifty appointments, with the hope that patients would attend at least forty that could be billed to insurance. He recommended more appointments for patients who were eligible for insurance coverage under the Act than he suggested for patients who paid cash. Burke's patients testified that even when treatments were not helpful, they felt pressured by Burke's runners to attend the appointments.

Burke also recommended treatments to patients who had not actually endured auto accidents. In late 2013, an undercover agent posing as "Mike Brown" sought treatment from Burke. "Brown" represented that he was experiencing neck pain after a recent automobile accident. Burke diagnosed the agent with a curved neck due to the "accident," and recommended a treatment of fifty in-office visits. The agent ultimately became a runner for Burke and brought in other undercover agents for treatment. None of the undercover patients had been injured or involved in automobile accidents, but Burke submitted claims for their treatments as well.

To conceal his use of runners, Burke sought to make it appear that Omar, Ibrahim, and Kidd provided marketing services for his clinic. Kidd and Ibrahim set up corporate entities that entered into false "consulting" and "marketing" contracts with Burke Chiropractic. Kidd and Ibrahim created invoices that billed Burke for phony marketing services and events. Burke also instructed his runners to coach patients that they should not disclose their recruitment to an insurance company.

-4-

A grand jury charged Burke, Ibrahim, and Kidd with conspiracy to commit mail fraud. *See* 18 U.S.C. § 1349. The indictment also charged mail fraud: twelve counts against Burke and three counts against Ibrahim and Kidd. *See* 18 U.S.C. § 1341. Burke's defense at trial was that he billed only for services that were medically necessary and thus did not participate in a scheme to defraud. Burke also claimed that Ibrahim and Kidd provided legitimate marketing services, and that Omar testified to the contrary solely to reduce his own sentence. Ibrahim and Kidd both said they did not know that Burke's use of runners was illegal, and did not intend to defraud the insurers.

A jury convicted Burke and Ibrahim on all counts and Kidd on the conspiracy and one count of mail fraud. The district court sentenced Burke to 90 months' imprisonment, Kidd to 24 months' imprisonment, and Ibrahim to 300 days in prison.

II.

All three defendants challenge the sufficiency of the evidence supporting their convictions. We review the issue *de novo*, construing the evidence in the light most favorable to the verdict. The question is whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Shafer*, 608 F.3d 1056, 1066-67 (8th Cir. 2010).

The defendants first argue that they did not commit mail fraud or conspire to do so because concealing the runner payments did not prevent the insurance companies from acquiring "material" information. Mail fraud requires, among other elements, proof that a defendant devised or participated in a "scheme to defraud." *United States v. Onwumere*, 530 F.3d 651, 653 (8th Cir. 2008). A conspiracy requires an agreement to devise or participate in such a scheme. *United States v. Anderson*, 783 F.3d 727, 749 (8th Cir. 2015). A scheme to defraud includes "acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent

the other party from acquiring material information." *United States v. Steffen*, 687 F.3d 1104, 1115 (8th Cir. 2012) (internal quotation omitted). The district court properly instructed the jury that information is "material" if it has "a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction." *See Neder v. United States*, 527 U.S. 1, 16 (1999); *Preston v. United States*, 312 F.3d 959, 961 (8th Cir. 2002).

In this case, the grand jury charged that the defendants devised a scheme to defraud insurance companies and conspired to do so. The prosecution, therefore, was required to prove that knowledge of the runner payments would have tended to influence or was capable of influencing an insurer's decision whether to reimburse the claims.

The evidence at trial met this standard for two reasons. First, if the insurance companies had known that Burke employed runners to recruit patients, then the companies would have investigated Burke's claims more carefully. Minnesota law mandates that insurers cover "necessary medical care" following an automobile accident. Minn. Stat. § 65B.44, subdiv. 1(b). Greater scrutiny would have been warranted because use of a runner makes it more likely that treatment is driven purely by desire for profit rather than medical necessity. Further investigation likely would have led the companies to deny some of the claims.

The government presented evidence that Burke sought reimbursement for treatments that were not medically necessary. For example, Burke diagnosed the undercover agent "Mike Brown" with a curved neck when the agent had no actual injury, and insisted on treating the agent even after he disclaimed any pain. Burke then submitted claims for treatment of both "Brown" and the undercover agents whom "Brown" recruited as patients, even though none of the agents was injured or involved in an automobile accident. Another patient, recruited by Kidd, testified that

treatments for which Burke submitted claims—a spinal adjustment, hot and cold pack therapy, and an ultrasound—were not administered to her during the appointment in question. A reasonable jury could have found that disclosure of the use of runners would have triggered investigation of these and other claims, and that active concealment of the runner payments was thus material to reimbursement decisions.

Second, Burke's use of runners was material because services delivered after the use of runners are noncompensable under Minnesota law. Employing, using, or acting as a runner to procure or solicit patients is a felony in Minnesota. The relevant statute also provides that "[c]harges for any services rendered by a health care provider, who violated this section in regard to the person for whom such services were rendered, are noncompensable and unenforceable as a matter of law." Minn. Stat. § 609.612, subdiv. 2. Therefore, the services that Burke provided to patients procured by runners were noncompensable, and insurers could have denied payment on that basis. Knowledge of the runners would have tended to influence the insurers' decision whether to pay on the claims.

On this second point, the defendants object that the Minnesota anti-runner statute does not allow denial of compensation. They cite a provision of the No-Fault Insurance Act that requires automobile insurance providers to cover up to $20,000 for medical expenses arising out of injuries sustained during an accident. Minn. Stat. § 65B.44, subdiv. 1(a)(1). They also rely on a clause in the Act providing that "[n]otwithstanding any other law to the contrary, a person entitled to basic economic loss benefits under this chapter is entitled to the full medical expense benefits set forth in subdivision 2." *Id.*, subdiv. 1(b).

We conclude that the noncompensability provision of the anti-runner statute governs here. The two statutory provisions do not directly conflict. The No-Fault Insurance Act guarantees certain benefits to a person who is injured in an automobile accident. The anti-runner statute addresses when a violation makes particular

services noncompensable for a particular provider, but does not preclude an injured person from receiving the guaranteed benefits through a qualifying provider. The No-Fault Insurance Act itself contemplates that an insurer may reject certain claims for reasons "other than that the person is not entitled to the basic economic loss benefits claimed." *Id*. § 65B.54, subdiv. 5. That a health provider or clinic is illegally owned could be one example of an "other" reason, *see Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic*, 88 F. Supp. 3d 985, 1009 (D. Minn. 2015); a violation of the anti-runner statute is another.

The legislature enacted a comprehensive scheme for no-fault insurance, but targeted the more specific problem of runner payments with a solution of noncompensability. A specific provision generally takes precedence over a general provision adopted earlier, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), especially when applying the general provision would render the later enactment inoperative. While a "notwithstanding" clause typically overrides conflicting provisions, *see Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993), it is also a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). To give effect, if possible, to every provision, the proviso that the No-Fault Insurance Act applies "notwithstanding any other law to the contrary" must be considered in context of the entire statutory plan. *See United States v. Novak*, 476 F.3d 1041, 1046-47 (9th Cir. 2007) (en banc); *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 797 (9th Cir. 1996). Under these circumstances, we conclude that the more specific provision governs.

Ibrahim contends that giving force to the noncompensability provision of § 609.612 would render superfluous another provision of the No-Fault Insurance Act, § 65B.44, subdiv. 2a(a). That provision states that "[a] person convicted . . . of employment of runners under section 609.612 may not enforce a contract for payment

of services eligible for reimbursement under subdivision 2 against an insured or reparation obligor." But those two provisions serve different purposes and are not entirely duplicative. Subdivision 2a(a) forbids a convicted person to enforce *any* contract for payment of services, whether or not the services resulted from the use of a runner. The noncompensability provision of § 609.612 is targeted more narrowly at services provided to a patient who was recruited by a runner.

Burke argues that because the noncompensability provision appears in a criminal statute, it applies only when a provider has been convicted of the Minnesota offense. Unlike § 65B.44, subdiv. 2a(a), however, the noncompensability provision applies to a provider who "violated" the section on runners, and does not specify that a conviction is required. Minn. Stat. § 609.612, subdiv. 2. Given the statute's use of "violated" rather than "convicted," we are not convinced that an insurer's ability to deny a claim for reimbursement based on use of runners is contingent on the State's allocation of resources to prosecute the offense criminally. Even if a conviction were required, moreover, knowledge of the runners would have allowed the insurers to alert Minnesota authorities with the power to prosecute Burke and thereby to render the claims noncompensable.

Burke also relies on *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996), which reversed a mail fraud conviction for insufficient evidence. There, the defendant psychiatrist extracted "undisclosed, unethical referral fees from an interested third party provider," but provided quality care and caused no financial harm to his patients. *Id*. at 441-42. The government's theory was that the physician deprived his patients of "the intangible right of honest services," 18 U.S.C. § 1346, but this court held that there was no evidence that the physician intended to defraud his patients. *Id*. at 442. By contrast, the government in this case did not charge a scheme to defraud patients, and there was sufficient evidence to support a finding that Burke intended to defraud insurance companies.

The defendants also argue that there is insufficient evidence of a scheme to defraud because they never made false representations directly to the insurance companies. This argument misunderstands the mail fraud statute. The gravamen of the offense is not a false representation to a victim, but the development of a scheme to defraud. *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010); *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995). The evidence here showed that Burke created false invoices and payment records purporting to show that phony companies operated by Kidd and Ibrahim provided marketing or consulting services when in fact Burke paid the men as runners. Although Burke never presented the false records to the insurers, the evidence supported a finding that the defendants created these entities and false records for use in the event of an inquiry by the insurance companies. Burke also advised the runners to coach patients not to tell the insurers how they had been recruited to the clinics. Even if the scheme was not fully executed, because the insurers did not make inquiries that required further action, the evidence supported a finding that the defendants devised a scheme to defraud.

Ibrahim argues that there is insufficient evidence on three counts of conviction for mail fraud, because there is no evidence that he illegally recruited the two patients whose treatment underlies those counts. Ibrahim concedes that he referred each patient to Burke Chiropractic and received payment for the referrals, but contends that he did not recruit them in violation of the anti-runner statute. He notes that one patient testified at trial that he approached Ibrahim on the recommendation of others in the community, and that there was no direct evidence about how the second patient was referred. The government, however, presented evidence that Ibrahim solicited other patients for treatment at Burke's clinic in return for compensation through a phony consulting firm. The jury reasonably could have discounted the patient's testimony or concluded that the referral was a result of Ibrahim's recruiting efforts in the community rather than voluntary action by the patient. There was sufficient evidence for a reasonable jury to infer that Ibrahim recruited the patients who were named in the mail fraud counts.

Kidd argues that there was insufficient evidence to establish that he intended to defraud. He says that he did not know that it was illegal to use runners and thus had no intent to conceal that fact. The evidence showed, however, that Kidd went so far as to form a corporate entity to receive payments from Burke based on invoices for bogus marketing events. This irregular behavior was sufficient to support an inference that Kidd knew of the illicit activity and acted with intent to defraud the insurers.

## III.

### A.

Burke and Kidd also argue that the district court abused its discretion by denying their motions to strike surplusage from the original indictment. They contend that the indictment's references to the Minnesota anti-runner statute were irrelevant and prejudicial because they could lead jurors to convict the defendants solely on the ground that they violated state law. The defendants did not file a renewed motion to strike surplusage from the second superseding indictment on which they were tried.

Assuming for the sake of analysis that the motion directed at the first indictment was sufficient to preserve the issue, *see United States v. Molinaro*, 11 F.3d 853, 858 n.9 (9th Cir. 1993), we conclude that there was no error. The references to the anti-runner statute in the indictments were permissible to explain the context of the defendants' participation in a scheme to defraud and how the scheme deprived insurers of material information. The defendants had motive to conceal their violations of the anti-runner statute, because knowledge of the runners would have triggered further inquiry by insurers, and a violation of the statute makes services noncompensable. The jury instructions explained the elements of the federal offense and ensured that the defendants would not be convicted merely for violating state law.

-11-

The district court therefore did not abuse its discretion in concluding that the references were not prejudicial surplusage.

Burke and Kidd also contend that the district court should have dismissed the indictment altogether for failing to allege a conspiracy to participate in a scheme to defraud. We have concluded that the evidence was sufficient to support the convictions, and the indictment was sufficient for similar reasons. Because the indictment alleged that the defendants agreed to and participated in a scheme to defraud that would conceal material information from insurers, the indictment adequately alleged an offense.

B.

The defendants next assert that the district court made errors in the final jury instructions. We review the instructions to determine whether, taken as a whole, they fairly and adequately submitted the issues to the jury. *United States v. King*, 898 F.3d 797, 807 (8th Cir. 2018).

Burke and Kidd argue that the court should have instructed the jury that the runner payments were not material if the treatment that Burke provided was reasonable and medically necessary. They contend that failing to clarify materiality allowed the jury to conclude the runner payments were material simply because the defendants violated state law. There was evidence, of course, that some of Burke's patients were undercover agents who were never injured in an automobile accident. But even assuming that treatments were medically necessary, Burke's services were noncompensable under Minnesota law if he procured the patients through the use of runners, so the use of runners was material for that reason alone. The proposed instruction thus misstated the law, and the court properly declined to use it.

Ibrahim and Kidd also challenge the final instruction that defined a scheme to defraud. The instruction stated that a scheme to defraud includes any plan "intended to deceive or cheat another out of money . . . by employing material falsehoods, omitting material facts or concealing material facts or by taking acts to create a false impression, mislead, or otherwise deceive in order to prevent another from acquiring material information." The asserted flaw is that the instruction encompassed "omitting material facts," because "mere nondisclosure" without a legal duty to disclose does not demonstrate a scheme to defraud. *Steffen*, 687 F.3d at 1114. The disputed language was drawn from a model jury instruction, *see* Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, § 6.18.1341 (2017), although this court has not addressed or approved the particular phrase about omitting material facts.

The disputed phrase does not stand alone in the instructions. The same instruction clarified that "[c]oncealment requires more than mere nondisclosure or silence." R. Doc. 197 at 27. The instruction also explained that a statement is "false" when it "omits a material fact." *Id.* Ibrahim and Kidd do not challenge these aspects of the instruction on appeal. Viewing the instructions as a whole, we do not think it reasonably likely that the jury believed it could find a scheme to defraud based on a plan to employ "mere nondisclosure." More likely, the jury understood that evidence of active concealment could prove a scheme to defraud, and that proof of a defendant's intent to deceive by "omitting material facts" could suffice when the omissions would result in "half-truths" and serve to make statements or representations "false." *See United States v. Stewart*, 728 F. App'x 651, 654 (9th Cir. 2018) ("[I]n a case involving half-truths, the duty to disclose arises from the truth half-spoken, not from a separate duty."); *cf. Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) (concluding that omissions from proxy statement may have presented company in "a false light that was materially misleading"); *United States v. Austin*, 823 F.2d 257, 259 (8th Cir. 1987) (holding that material omissions supported a finding of "false entry" in bank records).

-13-

Alternatively, even assuming that the reference to omitting material facts was error, we conclude that it was harmless. The prosecution's primary theory of the case was that the defendants actively concealed the use of runners—by creating fake companies supposedly operated by the runners, drafting bogus contracts between Burke Chiropractic and those companies, and preparing phony invoices for marketing or consulting services that were not performed by the companies. The government did not urge conviction on the ground of omissions alone. Given the strength of the evidence on active concealment, which the district court described as "overwhelming," we think it unlikely that the disputed language had a substantial influence on the outcome of the trial.

C.

Ibrahim and Kidd argue that the prosecutor committed misconduct in his rebuttal argument, and that a new trial is warranted. To warrant a new trial, the defense must establish that improper remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *United States v. Beckman,* 222 F.3d 512, 526 (8th Cir. 2000).

One complaint concerns statements about the shifting defense strategy. Burke's opening statement did not acknowledge that he paid his associates on a per-patient basis, but he later admitted such payments and maintained that they were permissible under state law. The prosecutor argued that Burke "had come up with an entirely different and new defense," and that the other defendants "had to jump on this bandwagon" after Burke said that "he paid them per patient instead of per marketing event." One defendant objected on the ground that the remark misstated the case and improperly shifted the burden of proof. The court overruled the objection.

-14-

We conclude that there was no abuse of discretion or plain error. Burke's opening statement admitted making payments to Ibrahim and Kidd, but did not acknowledge that the compensation was on a per-patient basis, so it was not a misstatement to describe Burke's defense as evolving. In any event, the court instructed the jury that opening statements and final arguments were not evidence, and there was no prejudice from a kerfuffle over whether the defense strategy changed during trial. What mattered in the end was whether the evidence proved the elements of the charges. Comments on consistency of the defense theories did not shift the burden of proof: the prosecution is entitled to address whether a particular defense explanation of the evidence raises a reasonable doubt. The defendants argue for the first time on appeal that the remarks were an impermissible attack on defense counsel, but questioning the strength of a defense theory based on shifting strategies does not personally disparage the attorneys.

Ibrahim and Kidd also object to the prosecutor's statement that "Omar, who testified, he took responsibility for what he's done and he pled guilty," and that "it's time for you, the jury, to hold his coconspirators responsible." This remark, to which there was no objection at trial, did not misstate the evidence or shift the burden of proof. Kidd claims that the reference to Omar's testimony impermissibly commented on Kidd's failure to testify. But reminding the jury that Omar testified after pleading guilty did not imply that Kidd was obligated to take the stand. The court instructed that there is no burden on a defendant to prove his innocence and that the jury must not consider in any way the fact that Ibrahim and Kidd did not testify. There was no plain error that warrants a new trial.

D.

Burke argues finally that the district court erred in calculating his advisory guideline range at sentencing. First, he asserts that the court incorrectly determined the estimated loss resulting from his fraud. The court found an actual loss to insurers

-15-

of $991,530, but an intended loss of $2,001,000; the guidelines count the larger amount. USSG § 2B1.1 comment. (n.3). The court calculated intended loss based on the number of patients who were recruited by Burke's runners and the amount that Burke billed insurers for those patients, whether or not the insurers had paid on the claims. Burke argues that the court should not have included amounts attributable to claims for medically necessary services. But even services that were medically necessary were noncompensable under state law if the patient was recruited by a runner. Accordingly, the court did not err by including those amounts as intended loss.

Burke also challenges a two-level increase for obstruction of justice under USSG § 3C1.1. The district court found that Burke perjured himself when he denied that he paid patients and denied that he knew that his runners were paying patients. A witness testifying under oath commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The court made a finding that encompassed all elements of perjury: "The Court finds that Defendant intentionally testified falsely about a material matter during trial and committed perjury." The record supports this finding. One runner, Omar, testified that he and Burke discussed that Omar would pay patients to attend appointments. Yet Burke denied knowing that his runners paid patients and testified that Omar was lying. The district court found that Omar was credible and that Burke intentionally testified falsely. The finding is not clearly erroneous.

\*   \*   \*

The judgments of the district court are affirmed.[2]

_____

[2]Kidd's motion for leave to file a pro se supplemental brief is denied, as it is contrary to Eighth Circuit policy and seeks to introduce additional evidence on appeal. *See United States v. Chappell*, 779 F.3d 872, 876 n.3 (8th Cir. 2015).