# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3085
_____

United States of America

*Plaintiff - Appellee*

v.

Paris B. Young

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 16, 2021
Filed: July 27, 2021

_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Paris Young was convicted by a jury of four counts related to unlawful possession of drugs and a gun. The district court[1] applied an enhancement under the Armed Career Criminal Act and sentenced him to 20 years in prison. Young appeals

---

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

(1) the district court's failure to ask about implicit bias during voir dire, and (2) the sentencing enhancement. We affirm.

I.

Young, a black man, was stopped for a traffic violation by two Kansas City, Missouri police officers. When they approached, Young fled. The officers caught him, arrested him, and searched his car. They found a small amount of marijuana, 12.4 grams of crack cocaine (wrapped in 46 individual bags), and a loaded gun with the serial number scratched off. Young was indicted on four counts: (1) possession with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(C); (2) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i); (3) being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(e)(1); and (4) possession of a firearm with an obliterated serial number, 18 U.S.C. §§ 922(k), 924(a)(1)(B).

Before trial, the district court did voir dire based on questions submitted by the parties.[2] The court asked several questions about biases, credibility, and the presumption of innocence. The district court also reminded the jurors to set aside their personal feelings and beliefs and to do their best to remain impartial.

Young submitted twelve proposed voir dire questions specifically related to race and explicit or implicit bias. The district court did not ask any of them. Near the end of voir dire, Young's attorney objected: "I just wanted to note for the record that I'd like to voir dire on race . . . . [and] if there's some kind of implicit bias that the jurors might have about [the defendant's race]." D. Ct. Dkt. 115 at 109–10. The

---

[2]Under the district court's own rules, Judge Kays does voir dire based on questions submitted by counsel. *See* Judge David Gregory Kays Case Procedures, Criminal Rules of Trial for Jury Trials, https://www.mow.uscourts.gov/sites/mow/files/DGK_Criminal_Rules_for_Jury_Trial.pdf. After voir dire, "counsel may be afforded an opportunity to pose additional questions to the panel." *Id.*

district court replied, "[T]here are race questions and there are implicit bias questions, right? . . . I'll be happy to broach the subject of race with this jury. Okay?" *Id.* at 110. Young's attorney replied, "Okay. That would be great." *Id.* The district court continued voir dire and asked if "anyone here . . . would find it difficult" to make a decision in the case because of the defendant's gender, race, or ethnicity. *Id.* at 111. No one raised a hand.

The jury convicted Young on all counts. Young's presentence investigation report found that he qualified for an enhancement of his sentence under the ACCA, 18 U.S.C. § 924(e), due to a prior conviction in Missouri for second degree murder and two convictions in Missouri for sale of cocaine base. The enhancement subjected him to a 15-year statutory minimum sentence for being a felon in possession. Young objected, arguing that his two prior drug convictions were not predicate offenses under the ACCA because at the time of the crimes, Missouri criminalized five drugs that were not on the federal drug schedule. The district court noted the objection but applied the enhancement.

The district court sentenced Young to 180 months in prison both on the possession with intent to distribute charge and the felon in possession charge, to run concurrently. The district court also sentenced Young to a concurrent 60 months on the obliterated serial number charge. The district court further sentenced him to 60 months on the possession of a firearm in furtherance of a drug trafficking crime charge to run consecutively with the other charges, for a total sentence of 240 months. The district court explained that even if the ACCA enhancement did not apply, it would have given Young the same sentence under the 18 U.S.C. § 3553(a) factors.

Young appeals the district court's voir dire on race, arguing that its failure to ask about implicit bias was reversible error. He also appeals the district court's application of the ACCA enhancement.

II.

"The adequacy of *voir dire* is not easily subject to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). We review "whether the district judge conducted voir dire in a way that protected a defendant's Sixth Amendment right . . . [for] an abuse of discretion." *United States v. Pendleton*, 832 F.3d 934, 943 (8th Cir. 2016) (citation omitted) (cleaned up). This is necessary because "the district court is in the best position" to evaluate potential biases against a defendant. *Id.* "The district court abuses its discretion when the overall examination of the prospective jurors and the charge to the jury fails to protect the defendant from prejudice or fails to allow the defense to intelligently use its peremptory challenges." *See United States v. Nelson*, 347 F.3d 701, 706 (8th Cir. 2003) (citation omitted) (cleaned up).

"There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Rosales-Lopez*, 451 U.S. at 190. When it comes to questioning prospective jurors about racial or ethnic bias, district courts are subject the United States Constitution and the Supreme Court's supervisory authority over federal courts. *Id.* at 189–90.

A. Constitutional Requirement

"[A] trial court's failure to inquire as to prospective jurors' ethnic or racial prejudices is constitutionally infirm only if ethnic or racial issues are inextricably intertwined with conduct of the trial, or if the circumstances in the case suggest a *significant likelihood* that racial prejudice might infect the defendant's trial." *United States v. Borders*, 270 F.3d 1180, 1182 (8th Cir. 2001) (emphasis added). In other words, the district court abuses its discretion when it denies the defendant's request to examine jurors on racial bias only where there are "substantial indications of the likelihood" of racial bias affecting the jurors in that case. *Id.* at 1183 (quoting *Rosales-Lopez*, 451 U.S. at 190).

-4-

There were no such indications here. Race was not "inextricably intertwined with conduct of the trial." *Id.* at 1182; *see also Ham v. South Carolina*, 409 U.S. 524, 527 (1973) (concluding that voir dire on racial prejudice was constitutionally required when a black civil rights activist believed he was being framed by law enforcement). Young's charges involved possession of drugs and a gun. His crimes were victimless, and nothing about his arrest or convictions concerned race. Young admits as much. Young Br. 19 (conceding that this case is one in which "race is NOT an issue"). Similarly, he points to nothing that presents a "significant likelihood that racial prejudice" infected his trial, so failure to voir dire on race was not "constitutionally infirm." *Borders*, 270 F.3d at 1182. Under these facts, Young can't show that voir dire on race was constitutionally required. And without that threshold being crossed, we see no reason why voir dire on implicit racial bias would be constitutionally required.

## B. Supervisory Requirement

Even when not constitutionally required, the Supreme Court "require[s] that questions directed to the discovery of racial prejudice be asked in certain circumstances." *Rosales-Lopez*, 451 U.S. at 190. One circumstance is when the defendant requests voir dire on the jurors' biases. *Id.* at 192. "Failure to honor [that] request, however, will be reversible error only where the circumstances of the case indicate that there is a *reasonable possibility* that racial or ethnic prejudice might have influenced the jury." *Id.* at 191 (emphasis added). Where the defendant is "accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups," the district court must make the requested inquiry. *Id.* at 192. But when "the defendant is charged with a non-violent victimless crime, such inquiry is not mandated and the reviewing court should consider the effectiveness of the trial court in reasonably assuring that the prejudice would be discovered if present." *Llach v. United States*, 739 F.2d 1322, 1333 (8th Cir. 1984) (citation omitted). Otherwise, the issue remains "primarily with the trial court, subject to case-by-case review by the appellate courts." *Rosales-Lopez*, 451 U.S. at 192.

As noted above, Young's crime was nonviolent and victimless.  So the only question is whether the district court's voir dire "eliminated . . . any reasonable possibility" that racial biases could impact the jury's decision.  *Id.* at 193.  We think that it did.  Before even mentioning race to the potential jurors, the district court asked if they held any religious, philosophical, political, or personal beliefs that would make it difficult for them to serve as jurors.  The district court also gave repeated reminders and admonitions against indulging biases.

But the district court did not stop there.  At Young's request, the district court asked specific questions about race and ethnic bias.  The district court reminded the potential jurors that they were to make decisions regardless of gender, race, or ethnicity.  As to Young, the district court stated:  "[T]he color of the defendant has nothing to do with your decisionmaking in this case.  Does anybody struggle with that?  If so, please raise your hand."  D. Ct. Dkt 115 at 110.  After seeing no hands, the district court finished voir dire.  While the district court had no obligation to question the potential jurors on racial or ethnic bias, it did—at Young's request.  The district court's voir dire went beyond the requirement to eliminate "any reasonable possibility" that racial or ethnic prejudice could have influenced the jury.  *Rosales-Lopez*, 451 U.S. at 193.

Young nonetheless takes issue with the district court's failure to inquire into potential *implicit* biases.  He asks us to establish a rule that a district court must ask questions "in a manner meant to elicit indications of *implicit* bias" whenever the defendant requests it.  Young Br. 12 (emphasis added).  We decline that invitation.  While "we do not minimize the importance to criminal defendants of removing the possibility of racial bias on the jury," we note that "how best to do that . . . is primarily left to the broad discretion of the district court."  *United States v. Diaz*, No.19-3352, 2021 WL 1783125, at *3 (2d Cir. May 5, 2021) (citation omitted) (cleaned up) (holding that the district court was not required to voir dire on implicit bias at the defendant's request).  The district court should eliminate *reasonable* possibilities of bias, not *every* possibility of bias.  And the district court did just that—both by asking the potential jurors if they had any beliefs or biases that would

prevent them from evaluating the case impartially, and by asking about racial prejudice. The district court reminded the potential jurors that Young's race could not be considered in their decision-making, and we find that the district court did not abuse its discretion during voir dire.

III.

Young next argues that the district court erred by enhancing his sentence under the ACCA for two prior serious drug offense convictions. Young claims his prior convictions are not "serious drug offenses" because at the time, Missouri outlawed some drugs that federal law did not.

The ACCA applies when a person violates 18 U.S.C. § 922(g) "and has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). A "serious drug offense" under the ACCA includes "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii).

"To determine whether a state drug conviction qualifies as a 'serious drug offense' under federal law, we apply a 'categorical approach' and compare the elements of the state offense with the elements set forth in § 924(e)(2)(A)(ii)." *United States v. Jones*, 934 F.3d 842, 842 (8th Cir. 2019) (per curiam). Young claims that the statute under which he was convicted, Mo. Rev. Stat § 195.211 (1989), criminalized certain drugs that federal law did not, making the state statute broader than its federal counterpart.

We rejected the same argument in *Jones*. "In Missouri . . . the identity of the controlled substance is an element of the offense under § 195.211, so the statute is divisible based on the drug involved." *Jones*, 934 F.3d at 842–43 (citation omitted)

-7-

(cleaned up). "In that circumstance, we may apply a modified categorical approach and look to judicial records" to evaluate the underlying offense. *Id.* at 843. Jones was convicted five times for selling cocaine base—a substance that "qualified as a 'controlled substance' under both state and federal law—so the state offenses match the federal definition on that score." *Id.* So, Jones was properly subject to the enhancement under the ACCA for his prior drug convictions. *Id.*

Young's Missouri convictions were for the sale of cocaine base. Cocaine base is a "controlled substance" under 18 U.S.C. § 812(c), Schedule II(a)(4), so "the state offense[] match[es] the federal definition." *Id.* Young's prior convictions were qualifying offenses under the ACCA and the district court did not err in applying the enhancement.

IV.

The judgment of the district court is affirmed.

KELLY, Circuit Judge, concurring.

I concur in the court's opinion but write separately to highlight the importance of adopting practices designed to mitigate the effects of implicit bias on legal proceedings.

To adequately address the impact of biases—racial or otherwise—on our legal process, we must first acknowledge that we may hold biases both consciously and unconsciously.[3] On the one hand, there are explicit biases: "attitudes and stereotypes

---

[3]I recognize there is an ongoing debate within the field of psychology regarding the appropriate terminology for these varying forms of bias. See generally Anthony G. Greenwald & Calvin K. Lai, Implicit Social Cognition, 71 Ann. Rev. Psych. 419, 420–22 (2020) (discussing, among other framings, explicit/implicit bias, direct/indirect bias, and conscious/unconscious bias). Such an academic debate is

that are consciously accessible through introspection and endorsed as appropriate." Jerry Kang et al., <u>Implicit Bias in the Courtroom</u>, 59 UCLA L. Rev. 1124, 1132 (2012); <u>see also</u> Jennifer K. Elek & Paula Hannaford-Agor, <u>Implicit Bias and the American Juror</u>, 51 Ct. Rev. 116, 116 (2015) (defining explicit bias as "the form of bias that a person intentionally endorses (and the traditional definition of racial prejudice that most people recognize)"). On the other hand, there are implicit biases—"attitudes and stereotypes that are not consciously accessible through introspection," Kang et al., <u>supra</u>, at 1132—which "occur[] when a person makes associations between a group of people and particular traits that then operate without self-awareness to affect one's perception of, understanding of, judgment about, or behavior toward others," Elek & Hannaford-Agor, <u>supra</u>, at 116.

Over the past several decades, social psychologists using a number of different tests (including the Implicit Association Test[4]) have found that individuals may harbor implicit biases even though they consciously decry comparable, explicit prejudices. <u>See</u> Anthony G. Greenwald & Linda Hamilton Krieger, <u>Implicit Bias: Scientific Foundations</u>, 94 Calif. L. Rev. 945, 955–56, 957 tbl. 1, 958 tbl. 2 (2006); <u>see also</u> Anthony G. Greenwald & Mahzarin R. Banaji, <u>Implicit Social Cognition: Attitudes, Self-Esteem, and Stereotypes</u>, 102 Psych. Rev. 4 (1995) (detailing the "indirect, unconscious, or implicit mode of operation for [a person's] attitudes and stereotypes"). These implicit biases may "affect our understanding, decisionmaking, and behavior, without our even realizing it," and "have real-world effects." Kang et al., <u>supra</u>, at 1126.

---

beyond the scope of this case, and I use the terms "explicit bias" and "implicit bias" as they have been commonly used.

[4]For a brief explanation of the Implicit Association Test and how it can be used to measure individuals' implicit biases, <u>see generally</u> Justin D. Levinson et al., <u>Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test</u>, 8 Ohio. St. J. Crim. Law 187, 190–96 (2010).

Many professions and industries have begun to explore and adopt practices to minimize the potential influence of implicit bias. See, e.g., Greenwald & Lai, supra, at 435–37; Jennifer Edgoose et al., How to Identify, Understand, and Unlearn Implicit Bias in Patient Care, Fam. Prac. Mgmt., Jul.–Aug. 2019, at 29, 31–33; Joan C. Williams & Sky Mihaylo, How the Best Bosses Interrupt Bias on Their Teams, Harv. Bus. Rev. (Nov.–Dec. 2019), https://hbr.org/2019/11/how-the-best-bosses-interrupt-bias-on-their-teams. The law should be no different, and numerous academics, practitioners, and judges have provided thoughtful commentaries and suggestions about how the judicial process might adapt to adequately limit the effects implicit biases may have. See, e.g., Kang et al., supra, at 1169–1186; Elek & Hannaford-Agor, supra, at 117–18; Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: the Problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 165–70 (2010); Nat'l Ctr. for State Cts., Strategies to Reduce the Influence of Implicit Bias 5–21 (2012).

Although the district court here did not abuse its discretion when conducting voir dire, see Rosales-Lopez v. United States, 451 U.S. 182, 190–91 (1981), I nevertheless suggest that more can be done to diminish any influence implicit bias may have on a jury's deliberations. For example, a district court might take meaningful steps to educate the venire and the empaneled jury about implicit bias. See Kang et al., supra, at 1181 (recommending that jurors "must be educated and instructed" to "become skeptical of their own objectivity and . . . become motivated to check against implicit bias"). Indeed, some courts show videos to juries and use special jury instructions in every case to "highlight[] and combat[] the problems presented by unconscious bias." Unconscious Bias Juror Video, U.S. Dist. Ct. for the W. Dist. of Wash., https://www.wawd.uscourts.gov/jury/unconscious-bias (last accessed July 12, 2021); see also Kang et al., supra, at 1182–83 (discussing the various strategies used by Judge Bennett, including a juror pledge and special jury instructions, to educate jurors about implicit bias). Such practices, although incomplete, cf. Greenwald & Lai, supra, at 435–37, may reduce the likelihood that jurors will rely on their implicit biases when reaching a verdict.

It is a cornerstone principle of our legal system that judicial proceedings shall be fair and unbiased.  See In re Murchison, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual bias in the trial of cases.").  And in recent years, scientific and psychological research has discovered that, despite our conscious efforts to think and do otherwise, we may unconsciously hold on to biases that affect our perception, understanding, and decisionmaking.  Although a court's reluctance or failure to address implicit bias may not amount under existing precedent to reversible error, courts should take it upon themselves to adopt creative solutions—informed by current scientific research—to ensure that reason, not implicit bias or explicit prejudice, guides jurors' deliberations.  Doing so would be an effort undertaken "not . . . to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy."  Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 868 (2017).

_____