# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-2653

_____

United States of America

*Plaintiff - Appellee*

v.

Antione Deandre Maxwell

*Defendant - Appellant*

_____

No. 22-2655

_____

United States of America

*Plaintiff - Appellee*

v.

Chavee E'Laun Harden

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Northern District of Iowa - Central

_____

Submitted: September 20, 2023
Filed: December 27, 2023

_____

Before LOKEN, WOLLMAN, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Antione Deandre Maxwell and Chavee E'Laun Harden were convicted of conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951. Maxwell was also convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court[1] sentenced Maxwell to 240 months' imprisonment on the robbery conviction and 120 months' imprisonment on the firearm conviction, to be served concurrently.[2] Harden was sentenced to 151 months' imprisonment.

Maxwell and Harden argue that the evidence is insufficient to support their convictions. Harden also argues that the district court erred by denying his motion to suppress evidence, by denying his request for an implicit bias instruction, and in calculating his sentencing range under the U.S. Sentencing Guidelines. We affirm.

I. Motion To Suppress

Lieutenant Steven Bose of the Waterloo, Iowa, Police Department initiated a traffic stop on a blue Chevrolet Trailblazer on November 4, 2020, at approximately 9:40 p.m. The Trailblazer did not stop until it came to a red light. The front-seat passenger opened the door and took off running, dropping a pair of black gloves. The passenger was a Black man wearing dark clothing and shoes. Bose pulled over,

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

[2]These sentences are being served concurrently with Maxwell's 360-month sentences for conspiracy and drug distribution convictions. See United States v. Maxwell, No. 22-2711, slip op. (8th Cir. Dec. 27, 2023).

exited his patrol car, and gave chase, but lost sight of the passenger. While continuing his search on foot, Bose saw a silver Chevrolet Malibu backed into a driveway at a home on West 10th Street in Waterloo. A man sat in the driver's seat with the door open, but was not wearing dark clothes. Additional officers soon responded to the area.

Bose stopped Dennis Brown, a Black man wearing dark joggers, on West 10th Street. After Bose reviewed his dash-cam video, he realized that the fleeing passenger was leaner than Brown and wore dark blue jeans. Brown also was not out of breath and maintained that he did not run from officers. Bose apologized for the detention and released Brown.

Officers found the Trailblazer, which was parked nearby. Bose could see two ski masks and one pair of black gloves inside the vehicle. He found another pair of black gloves in the street, where the passenger had exited the Trailblazer.

Meanwhile, dispatch reported that an armed robbery had occurred nearby and described the suspects as two Black men wearing black clothing and ski masks. One suspect was wearing black gloves, the other had hazel eyes, and both were armed with handguns. According to dispatch, the robbery had occurred approximately thirty to forty-five minutes earlier. Around the time of this report, a woman brought a set of keys to the officers, which she had found where Brown was detained. The keys belonged to the Trailblazer, which was registered to Harden.

Bose saw Brown and two others on the porch of the home on West 10th Street where the Malibu was parked. Officers detained Brown for a second time, set up a perimeter around the house, and decided to apply for a warrant. Lieutenant Kye Richter saw movement on the second floor of the home, which he believed was a person descending the stairs.

Richter spoke with the woman who was standing on the front porch. She told him that she rented the home with her boyfriend, Harden, and that her two young children—a four-month-old infant and two-year-old toddler—were alone in the house. She said that the unclothed infant was in a swing in the living room and reiterated that Harden was not at home. She pleaded for permission to go inside to tend to the children, but was told by Richter that she would not be allowed to enter without a police escort. She discussed the matter with Richter for approximately eleven minutes, but ultimately did not consent to the officers' entry into the residence.

Richter and Bose escorted the girlfriend into the home before the warrant application had been completed. They found Maxwell and Harden in the living room and took them into custody. Officers thereafter conducted a protective sweep of the home, during which they saw a bundle of currency and a pair of black tennis shoes. The infant was seated in a swing in the living room, and the toddler was asleep upstairs.

Search warrants issued hours later. Officers seized from within the residence commercially packaged marijuana products, $130 in currency and a black hair tie from a table in the living room, as well as $1,741 in currency from within a bedroom. The silver-hued Malibu belonged to Maxwell and held a .22 caliber revolver and a .45 caliber pistol within, as well as a receipt for marijuana products and a variety of marijuana products in a green reusable grocery bag. Officers recovered black gloves and ski masks from within Harden's Trailblazer.

Harden moved to suppress evidence discovered during the protective sweep, as well as the evidence seized pursuant to the warrants, arguing that the officers' entry into the home violated the Fourth Amendment. Following a hearing, a magistrate judge[3] issued a report and recommended that the motion be denied, which

_____

[3]The Honorable Mark A. Roberts, United States Magistrate Judge for the Northern District of Iowa.

the district court adopted without modification. On appeal from the denial of a motion to suppress evidence, we review for clear error the district court's factual findings and *de novo* its conclusions of law. United States v. Sanders, 4 F.4th 672, 676 (8th Cir. 2021).

Harden argues that the district court erred in denying his motion to suppress evidence. He contends that there was no probable cause to believe that any robbery suspect would be found in his house on West 10th Street, nor were there exigent circumstances justifying entry into the home. Harden thus argues that the warrantless entry and protective sweep were unconstitutional.

The Fourth Amendment protects the right of people to be secure in their homes against unreasonable searches and seizures. "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393–94 (1978) (quoting McDonald v. United States, 335 U.S. 451, 456 (1948)); see Payton v. New York, 445 U.S. 573, 586 (1980) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."). The Supreme Court has long considered "the need to assist persons who are seriously injured or threatened with such injury" as an exigency that justifies a warrantless search. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). The Fourth Amendment thus "allows officers to enter a home if they have 'an objectively reasonable basis for believing' that such help is needed, and if the officers' actions inside the home are reasonable under the circumstances." Caniglia v. Strom, 593 U.S. 194, 206 (2021) (Kavanaugh, J., concurring) (quoting Bringham City, 547 U.S. at 406).

To determine whether the officers had a reasonable basis to enter Harden's home without a warrant, "we look to the facts known to the officers at the time they made the decision to enter." Sanders, 4 F.4th at 677. When Bose and Richter entered

Harden's residence on West 10th Street, they had pieced together the following information: A robbery had occurred that involved at least two darkly clad, armed suspects wearing ski masks, one of which wore black gloves. A suspect dropped a pair of black gloves as he ran from the Trailblazer, which belonged to Harden. There were ski masks and another pair of gloves inside the Trailblazer. The Trailblazer's keys were found where Brown, dressed in all black, had been detained. Brown went to Harden's home after he had been detained. Although Harden's girlfriend insisted that Harden was not home, Richter had seen what he believed was a person going down stairs. An infant and a toddler were in the home, with the infant unclothed in a swing. The man who had parked the Malibu at the home was no longer outside.

Based on the information known to the officers, they reasonably believed that Brown was involved in the robbery, that he drove the Trailblazer, and that at least one more armed robbery suspect was within the home. They reasonably decided that Harden's girlfriend could not re-enter without being escorted by officers. Both Richter and Bose knew that it would take hours before the warrant issued, and a reasonable officer would have known that it is dangerous to leave an infant and toddler alone for that amount of time. Once the officers entered, they arrested Maxwell and Harden and performed only a protective sweep to ensure that no one was hidden in the home. Officers did not seize evidence until a warrant authorized them to do so. We conclude that the circumstances here were sufficiently exigent to allow officers to enter, in light of the very young unattended children that were either alone (if Harden's girlfriend were to be believed) or with at least one armed robbery suspect (as Bose and Richter reasonably believed). See Sanders, 4 F.4th at 677–78 (holding that officers had objectively reasonable basis to enter the house without a warrant because the circumstances indicated a serious concern for the safety of the children inside the home); United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989) (holding that an officer's entry into the home, his limited search, and the seizure of firearm was reasonable because an eleven-year-old boy and small girl would be left alone at the home after the arrest of armed robbery suspect). Bose and

Richter's warrantless entry thus was reasonable and constitutional under the exigent circumstances doctrine. See Caniglia, 593 U.S. at 208 (Kavanaugh, J., concurring) (explaining that the exigent circumstances doctrine permits warrantless entries in "cases involving unattended young children inside a home"); Mincey, 437 U.S. at 392 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (citation omitted)).

## II. Sufficiency of the Evidence

The case proceeded to trial. Bose, Richter, and other law enforcement officers testified regarding the investigation leading to the arrest of Maxwell, Harden, and Brown. The government entered into evidence the items seized from Maxwell's Malibu, from Harden's Trailblazer, and from Harden's residence, as well as photos of the scene and the evidence seized. Harden's girlfriend testified that she knew that Harden and Maxwell were in the living room when she told officers that no one was home besides the children.

The government called the robbery victims as witnesses. J.B. testified that she and G.H. purchased marijuana from Colorado dispensaries to sell to customers in Waterloo. They had a practice of locking their apartment door when a customer arrived and immediately locking it after the customer left the apartment. J.B. explained that on November 4, 2020, she was watching television when a customer she knew by the name Vee stopped by the apartment to purchase marijuana. Vee stayed longer than usual, and when he got up to leave, G.H. followed him to lock the door. After Vee exited but before G.H. could lock the door, two Black men wearing black clothing and ski masks entered the apartment.

The heavier of the two men wore black gloves and held a gun to J.B.'s head. When shown the .22 caliber revolver found in the Malibu, J.B. testified that it looked familiar and explained that it had the same rounded chamber as the one that was used

against her. According to J.B., the robber asked if she was ready to die and dragged her by the shirt, telling her to gather the marijuana products for him. She did so and placed them in a green reusable grocery bag. She identified both the marijuana products and the grocery bag at trial. The robber hit her with the butt of his gun when she told him that there was no money hidden in her room.

G.H. testified that when Harden, whom he knew as Chavee or Vee, left the apartment on November 4, 2020, two men wearing black ski masks and holding handguns entered. The robber with hazel eyes and an all-black handgun grabbed G.H. and brought him to his bedroom, demanding to know where the money was kept and asking G.H. if he wanted to die. When shown the .45 caliber pistol found in the Malibu, G.H. testified that it was the same color, model, shape, and type of gun as the one that had been used against him. G.H. complied with the robber's demands and at least $1,000 was stolen from him. J.B. testified that the money was bound with a black hair tie. The robbers thereafter brought J.B. and G.H. back into the living room, stole their cell phones, and left. G.H. saw the robbers leaving in a silver vehicle, which he described as being similar to a PT Cruiser, but with a boxy frame.

After the robbers left, J.B. used her iPad to see if she could find their cell phones, which appeared to be nearby. J.B. and G.H. went outside to try to find them, but were unable to do so. Their neighbor returned to his apartment in the meantime and allowed J.B. to use his cell phone to call 911. During the 911 call, J.B. told the operator that the robbery occurred some thirty to forty-five minutes earlier.

G.H. identified the grocery bag that was found in Maxwell's Malibu, as well as a receipt from a dispensary that he had visited on October 31, 2020, and some of the marijuana products he had purchased in Colorado for resale in Waterloo. G.H. identified Harden at trial, but J.B. was unable to do so.

The district court denied Maxwell's and Harden's motions for judgment of acquittal at the close of the government's evidence and denied their post-trial motions after the jury entered its guilty verdicts. The jury acquitted Brown.

Maxwell and Harden argue that the district court should have granted their motions for judgment of acquittal or their motions seeking a new trial. "We apply the deferential sufficiency of the evidence standard to the denial of a motion for acquittal, and we review the denial of a motion for a new trial for abuse of discretion." United States v. Patterson, 68 F.4th 402, 419 (8th Cir. 2023).

We first consider whether the government proved conspiracy to interfere with commerce by robbery. Maxwell and Harden contend that there was no evidence of a conspiracy or any agreement to commit robbery. For conviction, the government was required to prove that there was an agreement to achieve an illegal purpose, that Maxwell and Harden knew of the agreement, and that they knowingly participated in the conspiracy. United States v. McAdory, 501 F.3d 868, 871 (8th Cir. 2007).

The evidence presented at trial overwhelmingly supports the guilty verdicts. Maxwell and Harden admitted in their post-arrest interviews that they were together at Harden's home before the armed robbery occurred. J.B. and G.H. testified that Harden unlocked the door, allowing Maxwell and the other robber to enter the apartment and commit the robbery. G.H. identified the robber who held him at gunpoint as having hazel eyes, and the government submitted a photo of Maxwell that showed his distinctive eye color. Maxwell and Harden returned to Harden's residence with the cash and marijuana products, where they were arrested. The cash was found in Harden's home and the firearms, grocery bag, and marijuana products were found in Maxwell's Malibu. It does not matter that the government did not submit phone records, text messages, or social media communications between Maxwell, Harden, or Brown. Based on the evidence presented and the reasonable

inferences drawn therefrom, a jury could easily find that Maxwell and Harden knowingly participated in a conspiracy to commit armed robbery.

Maxwell argues that the government failed to prove that he possessed the Springfield XDs 45 ACP, .45 ACP caliber pistol. As just discussed, the evidence demonstrated that Maxwell entered J.B. and G.H.'s apartment and stole money and marijuana. G.H. testified that the Springfield pistol was the same as the gun used against him. The government presented evidence that the pistol was found in Maxwell's Malibu, which, according to security-video footage of a nearby business, was parked by Harden moments before Maxwell ran from the Trailblazer. This timing supports a finding that Maxwell placed the pistol and the robbery proceeds in the Malibu before the two vehicles left J.B. and G.H.'s apartment. The evidence supported the jury's finding that Maxwell possessed the firearm.

We conclude that the district court did not err in denying Maxwell's and Harden's motions for judgment of acquittal or abuse its discretion in denying their motions for a new trial.

### III. Jury Instructions

Harden argues that the district court erred when it declined to give the following jury instruction on implicit bias:

> Do not decide the case based on "implicit biases." Everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is "implicit biases," that we may not be aware of. These hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions. Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that

you return a just jury verdict, based solely on the evidence, your individual evaluations of that evidence, your reason and common sense, and these instructions. Our system of justice is counting on you to render a fair decision based on the evidence, not on biases.

The district court instead instructed the jury to "take this case and give it your most careful consideration, and then without fear or favor, prejudice or bias of any kind, return a verdict" based on the evidence and the jury instructions. Before trial began, the court had told the venire that it must set aside any racial bias.

We conclude that the district court did not abuse its discretion in denying the proposed instruction. In United States v. Young, we held that the district court was not required to ask the venire about implicit bias during voir dire and declined the invitation "to establish a rule that a district court must ask questions 'in a manner meant to elicit indications of *implicit* bias' whenever the defendant requests it." 6 F.4th 804, 809 (8th Cir. 2021). Similar to Young, we recognize here "the importance to criminal defendants of removing the possibility of racial bias" from the jury's deliberations and decision, but conclude that it is within the district court's discretion to decide "how best to do that." Id. (quoting United States v. Diaz, 854 F. App'x 386, 390 (2d Cir. 2021) (per curiam)). The district court acted well within its discretion when it denied the proposed implicit bias instruction.

## IV. Harden's Sentence

At sentencing, the district court recounted Harden's role in the conspiracy, explaining that Harden used his relationship with J.B. and G.H. to gain entry into the apartment. "[A]s he left, he opened the door for Maxwell and Brown, who then charged in, armed with firearms, and robbed and beat at least one of the victims."[4]

---

[4]Although the jury acquitted Brown, the district court found by a preponderance of the evidence that Brown conspired with Maxwell and Harden to rob J.B. and G.H.

Harden Sentencing Tr. 13. The district court also found that Harden committed perjury when he testified in his own defense and that he had tried to influence a witness to lie for him. Over Harden's objections, the district court thus increased his base offense level by 6 because "a firearm was otherwise used" during the robbery, U.S.S.G. § 2B3.1(b)(2)(B), by 2 because J.B. sustained bodily injury, U.S.S.G. § 2B3.1(b)(3)(A), and by 2 for obstruction of justice, U.S.S.G. § 3C1.1.

Harden argues that the district court clearly erred in finding that his relevant conduct included the use of firearms and bodily injury. He contends that those specific offense characteristics were outside the scope of the jointly undertaken criminal activity and were not reasonably foreseeable in connection with that activity. U.S.S.G. § 1B1.3 (defining defendant's relevant conduct in jointly undertaken criminal activity to include "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity"). We disagree.

The evidence at trial established that Harden knew that firearms would be used during the robbery. The sequence of events leading up to and following the robbery suggests significant planning and knowledge: the three men met at Harden's home before the robbery, Maxwell and Brown entered the apartment as Harden left, Harden drove the firearms and robbery proceeds to his home, Maxwell and Brown drove Harden's vehicle away from the scene before returning to Harden's home. Moreover, the government presented evidence that the revolver used by Brown to strike J.B. belonged to Harden's best friend who was also the brother of Harden's girlfriend. The district court did not clearly err in finding that the use of firearms was within the scope of the robbery and reasonably foreseeable.

It follows that Harden is accountable for J.B.'s bodily injury. The Guidelines commentary speak to the scenario in which defendants agree to commit robbery and

one of the defendants injures a victim during the course of that robbery. "The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense)." U.S.S.G. § 1B1.3, cmt. n.3(D); see United States v. Jackson, 419 F.3d 839, 843 (8th Cir. 2005) (finding no clear error in the district court's determination that defendant was accountable for co-conspirator's death threat, even though she may not have agreed to the threat). It does not matter that Harden was not in the apartment when the bodily injury happened. See United States v. Miller, 41 F.4th 1019, 1024 (8th Cir. 2022) ("A co-conspirator's actions can count as relevant conduct, even if the defendant wasn't present when the crime occurred.").

The district court also did not clearly err in finding that Harden had obstructed the administration of justice. At trial, the government submitted a recorded phone conversation in which Harden told his girlfriend to instruct a friend to say that the friend drove Harden to the victims' apartment on November 4, 2020. Harden testified at trial that the friend drove him to the victims' apartment. He also testified that he did not participate in the robbery and did not know who the robbers were. In light of the friend's testimony that he did not drive Harden to the apartment and the evidence presented regarding the robbery, the district court did not clearly err in finding that Harden "attempted to get another person to falsely claim that he was driven to the apartment by somebody else" and that Harden's trial testimony was false. Harden Sentencing Tr. 14; see United States v. Kidd., 963 F.3d 742, 753 (8th Cir. 2020) ("A witness testifying under oath commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). We find no error in the district court's Guidelines calculations.

## V. Conclusion

The judgments are affirmed.

_____