# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3674
_____

United States of America

*Plaintiff - Appellee*

v.

Jaylyn Devell McGhee

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: January 17, 2025
Filed: February 28, 2025
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Following a shooting outside Jaylyn McGhee's house, law enforcement obtained a warrant to search his home and found drugs and guns inside. He was charged with drug- and firearm-related offenses. He conditionally pled guilty and was sentenced to 60 months' imprisonment and 3 years' supervised release, and now

appeals the district court's[1] denial of his motion to suppress and application of a sentencing enhancement. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

In July 2021, while sitting with his six-year-old son in a parked vehicle outside his house in Davenport, Iowa, McGhee was shot at. McGhee's son suffered gunshot wounds to his left hand and right wrist, so McGhee drove him to the hospital for treatment. Pursuant to shots-fired 911 calls, law enforcement responded to the scene, not knowing whether any injuries had resulted.

Officers arrived at the scene to find eight shell casings, "a bag of suspected narcotics" that was later identified as heroin and fentanyl, and a loose $5 and $1 bill on the street outside McGhee's house. Neighbors and the 911 callers informed law enforcement that a vehicle had arrived at the house and parked on the side of the street for a brief period. Shortly after, another vehicle pulled up next to it. Witnesses reported that they heard eight shots fired, and then saw both vehicles quickly drive away. The hospital in which the child was treated reported that the child had arrived in a vehicle that had "eight . . . spots of damage suspected from being from gunfire." This information led law enforcement to believe the injured child at the hospital might be connected to the shots-fired call at McGhee's house.

Some of the investigators walked up the paved path leading to the front door of McGhee's house and knocked. Meanwhile, another officer, Davenport Police Department Corporal[2] Murphy Simms, noticed a second door on the right side of the house; he stood in the front yard outside a chain-link fence separating the front and side yards and watched the side door "just for perimeter security to ensure nobody tried to sneak out or run or any of that matter." Just below the side door were three

---

[1]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

[2]Corporal Simms was a detective rank in July 2021.

steps, which led down to an elevated wooden deck that was a step off of ground level. The fence gate had been left open and the side yard, deck, stairs, and side door were visible through and over the fence.

While observing the side door, the officer noticed "several spots of blood spatter as well as an unknown white or brown powdery substance" on the deck. Corporal Simms then walked through the gate and noticed the blood spatter extended up the stairs and onto the door and its handle, along with the side of the house. He further noted the powdery substance looked consistent "in its makeup" with illegal narcotics and with the substance found in the street amongst the shell casings. Based on the blood spatter and reports from witnesses that no one had gotten out of the victim vehicle, he was concerned there could be a victim in the house or in the backyard who was bleeding. Corporal Simms also learned that another investigator had entered the side yard after Corporal Simms and had peeked through the window and seen a large amount of blood spatter in the kitchen.

In an attempt to determine whether exigent circumstances such as a medical emergency required entry into the home, Corporal Simms called Detective Farra, who was at the hospital with the victim and McGhee. Detective Farra told Corporal Simms that according to McGhee, McGhee had tried to carry his son inside through the side door following the shooting, but the door was locked so he had returned to his vehicle and rushed to the emergency room. In light of this new information, Corporal Simms grew less concerned that someone was inside the house and in immediate need of medical assistance and instead started to think McGhee may have been lying about going inside.

Corporal Simms then sought a search warrant for the home. In his search warrant application, Corporal Simms described what he had seen on the deck in the side yard, saying:

> On the porch leading to the side door was a large amount of blood spatter leading from the opening in the fence to the door. The same

blood spatter was also visible on the door, the house next to the door, the door handle, as well as just inside the door on the floor which was visible through a window. Near the fresh blood spatter on the porch was an additional white chalky/powdery substance on the ground.

A search warrant was issued. Upon its execution, law enforcement found a plastic baggie containing 5.48 grams of cocaine base and 17.96 grams of heroin and fentanyl in McGhee's kitchen. The trail of blood extended through the kitchen and into the nearby master bedroom, where two firearms were found. McGhee was later charged with one count of possession with intent to distribute heroin, fentanyl, and cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and one count of being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

McGhee unsuccessfully moved to suppress the drugs and guns found in his house. In relevant part, he argued that the search warrant application was based on evidence that was illegally obtained. The only evidence linking McGhee's home to the crime, McGhee argued, was the blood spatter and powdery substance, and the officers would never have seen either the blood or the powder had they not impermissibly entered McGhee's yard and peered through his window in violation of the Fourth Amendment. McGhee also argued that neither the exigent circumstances nor the good-faith exceptions to the search warrant requirement applied. The Government responded that the officers' actions were justified by the plain-view doctrine and exigent circumstances, that the search warrant affidavit was supported by sufficient evidence even if the evidence at issue was excluded, and that the agents reasonably relied on the warrant in good faith. Following testimony from Corporal Simms and one other officer at an evidentiary hearing on the matter, the district court denied the motion. The court determined that Corporal Simms had not entered the house's curtilage until he walked through the open gate into the side yard. By the time he walked through the gate, the court noted, Corporal Simms had already lawfully seen the blood spatter and white powdery substance from his lawful vantage point outside the fence, which created exigent circumstances, allowing him to investigate further in order to ensure no one was in need of medical attention.

-4-

McGhee conditionally pled guilty to both counts, preserving the right to appeal his sentence and the district court's denial of the motion to suppress. Prior to sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR) in which it recommended a four-level enhancement under United States Sentencing Guidelines (USSG) § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense—in this case, drug trafficking. The fact section of the PSR noted that law enforcement had been investigating McGhee for drug offenses and had conducted several controlled buys from McGhee in the months prior. McGhee objected to the enhancement, contending that the record did not establish a connection between drug activity and firearm use, and further asserting that the commentary to the Guidelines impermissibly broadened the Guidelines and thus should not be applied. The district court overruled McGhee's objection, finding—based on the unobjected to facts in the PSR, the testimony at the suppression hearing, and additional testimony at sentencing—that the firearms found in McGhee's house were connected to drug trafficking in that same house. In coming to this conclusion, the district court noted that McGhee had five times sold drugs (cocaine, heroin, and fentanyl) to cooperating sources or confidential informants during controlled buys in 2020 and 2021, and that following the July 2021 shooting, officers found drugs in the kitchen and guns in the bedroom—"[a]nd the blood trail absolutely show[ed] that the defendant and his son, or at least his son, traversed between those two rooms while bleeding." The court sentenced McGhee to 60 months' imprisonment on each count, to be served concurrently, and 3 years of supervised release.

McGhee appeals. He first argues the district court erred in denying the motion to suppress because the search warrant was based on unlawfully obtained evidence. He further argues the district court erred in overruling his objection to the four-level enhancement at sentencing, claiming the district court applied the enhancement by relying on commentary to the Guidelines, which he asserts impermissibly expands the Guideline language.

II.

McGhee argues that the district court erred in denying his motion to suppress. He claims the bases for obtaining the warrant—the blood spatter and powdery substance—were observed only after officers trespassed into the curtilage of McGhee's home. "This [C]ourt analyzes the denial of a motion to suppress under a 'mixed standard,' reviewing findings of fact for clear error and legal findings de novo. United States v. Avalos, 984 F.3d 1306, 1307 (8th Cir. 2021) (citation omitted).

"The Fourth Amendment protects the right of people to be secure in their homes against unreasonable searches and seizures." United States v. Maxwell, 89 F.4th 671, 676 (8th Cir. 2023). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (alteration in original) (citation omitted). "The area 'immediately surrounding and associated with the home—what our cases call the curtilage—is part of the home itself for Fourth Amendment purposes.'" Luer v. Clinton, 987 F.3d 1160, 1165 (8th Cir. 2021) (quoting Florida v. Jardines, 569 U.S. 1, 6 (2013)).

The first dispute is whether the officers entered the curtilage of McGhee's home. "Determining whether a particular area is part of the curtilage of an individual's residence requires consideration of 'factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" United States v. Bausby, 720 F.3d 652, 656 (8th Cir. 2013) (citation omitted). Those factors (the Dunn factors) include: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." Id. (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)).

Here, two distinct areas are at issue: (1) the front yard, and (2) the side yard containing the deck and stairs to the side door. Though the front yard was close in proximity to the home, it was not protected by a fence or any other enclosure, and no efforts were taken to shield the yard from public observation or entry—unlike other parts of McGhee's yard. The yard contained a paved walkway to the front door, where the mailbox was located. Images of the house show an apparent worn path through the grass from the front door to the chain-link fence separating the front yard from the side yard. Considering the Dunn factors, we conclude the district court did not err[3] in determining that the front yard was not within the curtilage of McGhee's home. See also Bausby, 720 F.3d at 656-57 (determining that a front yard that was enclosed by a chain-link fence but displayed a motorcycle and other items was not curtilage); Reeves v. Churchich, 484 F.3d 1244, 1255 (10th Cir. 2007) (holding front yard was not part of curtilage where there was no evidence that front yard was enclosed, used for intimate activities, or protected from observation); United States v. Hayes, 551 F.3d 138, 145 (2d Cir. 2008) ("The sanctuary of the home simply does not extend to the front yard."). The side yard, however, was directly adjacent to McGhee's home, was enclosed by a fence, contained items like a grill that suggested it was for family use, and was partially obstructed from further view by trees and a back fence. Thus, McGhee's side yard is part of his home's curtilage. Cf. Dunn, 480 U.S. at 301-03 (determining that barn 60 yards from home and not enclosed by fence was not part of the home's curtilage).

The second dispute is whether the officers violated the Fourth Amendment by entering McGhee's side yard curtilage. As a threshold matter, simply viewing the blood spatter and powdery substance while standing in the front yard did not violate

---

[3]There is a conflict in this Court's case law as to whether a district court's determination that an area is part of a home's curtilage is a factual finding reviewed for clear error or a legal conclusion reviewed de novo. United States v. Wells, 648 F.3d 671, 675-77 (8th Cir. 2011). We need not resolve that conflict because here, even under de novo review, the front yard was not within the curtilage of McGhee's home.

the Fourth Amendment. Though the blood spatter and powdery substance were in the side yard, which is curtilage, Corporal Simms first saw it when he was standing in the front yard, which is not part of the home's curtilage. "That the area is within the curtilage does not itself bar all police observation.'" United States v. Mathias, 721 F.3d 952, 957 (8th Cir. 2013) (alteration in original) (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)). Even within the curtilage of a home, there is no reasonable expectation of privacy with respect to police observation of what is plainly visible from a vantage point where the police officer has a right to be. See Ciraolo, 476 U.S. at 213 ("[T]he mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."). Because the officers first viewed the blood spatter and powdery substance from the front yard—a place where they had the right to be—they did not violate the Fourth Amendment in doing so. See also United States v. Gerard, 362 F.3d 484, 488 (8th Cir. 2004) (finding no error in district court's determination that garage was not within farm's curtilage and thus no illegal search when officer climbed a ladder to peer into that garage).

The officers' entry into the side yard following observation of the blood spatter and powdery substance was then justified by the exigent circumstances exception to the warrant requirement. "[A] warrant is not required for a search under the [F]ourth [A]mendment when exigent circumstances exist." United States v. Chipps, 410 F.3d 438, 442 (8th Cir. 2005). Such "circumstances exist if a reasonable law enforcement officer could believe that a person 'is in need of immediate aid.'" Id. (citations omitted). A district court's "findings of historical fact" are factual findings reviewed for clear error, while the "ultimate determination of whether the facts as found constitute exigent circumstances" is a legal conclusion reviewed de novo. United States v. Ramirez, 676 F.3d 755, 759 (8th Cir. 2012). Here, officers arrived on scene in response to shots-fired calls, they found eight shell casings in front of the house, and they had reason to believe there was at least one victim. Furthermore, Corporal Simms testified that the "ultimate reason" that they followed that blood trail was "to see if there were any victims that potentially could have ran

-8-

into the house or ran to the backyard who were . . . obviously bleeding." The evidence here was sufficient to lead a reasonable officer to believe that a person "is in need of immediate aid," thus triggering the exigent circumstances exception. See Chipps, 410 F.3d at 442-44 (citations omitted) (holding that law enforcement's observation of blood on the ground in front of a defendant's front door provided exigent circumstances because the officer who observed the blood could reasonably have believed someone's life was in danger). Therefore, the district court did not err in denying the motion to suppress.[4]

III.

McGhee also argues that the district court committed procedural error by applying a four-level sentencing enhancement pursuant to USSG § 2K2.1(b)(6)(B). "We review the district court's application of the Guidelines and imposition of sentencing enhancements de novo" and "review factual findings at sentencing for clear error." United States v. Foard, 108 F.4th 729, 736 (8th Cir. 2024). We review "for clear error a district court's finding that a defendant possessed a firearm in connection with another felony offense" pursuant to USSG § 2K2.1(b)(6)(B). United States v. Mitchell, 963 F.3d 729, 731 (8th Cir. 2020). "[S]entencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." Foard, 108 F.4th at 736 (alteration in original) (citation omitted).

Under USSG § 2K2.1(b)(6)(B), a defendant is subject to a four-point sentencing enhancement if he "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony." In the context of drug trafficking, the commentary to the Guidelines dictates that the enhancement applies when "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug

---

[4]Because we resolve this issue on the existence of exigent circumstances, we need not consider whether the good-faith exception applied.

paraphernalia." <u>Id.</u> comment. (n.14(B)). In most other circumstances, the commentary says the enhancement applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." <u>Id.</u> comment. (n.14(A)).

McGhee argues that the commentary "impermissibly expand[s] the [G]uidelines" and is thus entitled to no deference. Appellant Br. 16. He points to <u>Stinson v. United States</u>, 508 U.S. 36, 45-46 (1993), in which the Supreme Court noted that commentary to the Guidelines is binding "if the [G]uideline which the commentary interprets will bear the construction" but not if the construction is "plainly erroneous or inconsistent with" the corresponding Guideline. Appellant Br. 16 (quoting <u>Stinson</u>, 508 U.S. at 45-46). This Court has repeatedly applied the challenged language post-<u>Stinson</u> without issue. <u>See</u> <u>United States v. Tucker Jackson</u>, 106 F.4th 772, 777 (8th Cir. 2024) (quoting language from commentary note 14(B) in determining the district court did not clearly err in applying the enhancement); <u>United States v. Lopez</u>, No. 22-3203, 2023 WL 6474464, at *2 (8th Cir. Oct. 5, 2023) (per curiam) (same); <u>United States v. Sewalson</u>, 36 F.4th 832, 833 (8th Cir. 2022) (applying the commentary language to a cross-reference question). Thus, the district court did not err in relying on the commentary to apply the enhancement.

To the extent McGhee challenges the factual underpinnings of this enhancement,[5] the record sufficiently supports the district court's factual findings. As the district court found, McGhee had sold cocaine, heroin, and fentanyl in five controlled buys previously. Then in July 2021, after McGhee was shot at outside his home, officers found heroin, fentanyl, loose money, and eight spent shell casings on the street outside his home. Furthermore, inside his house, officers found

---

[5]McGhee does not explicitly challenge the factual underpinnings of this sentencing enhancement, but also does not concede that the enhancement is supported by the record. He says, "[t]he [G]overnment did not put forth any evidence that the firearm was actually used to facilitate the drug trafficking offense," Appellant Br. 18, which suggests a challenge to the factual underpinnings. Thus, we briefly address the factual basis for the enhancement here.

cocaine, heroin, and fentanyl in the kitchen, firearms in the bedroom, and a trail of blood connecting the rooms. Thus, as the district court found, the blood trail, in combination with the drugs and money found outside McGhee's house, indicate that McGhee "possessed simultaneously [the drugs and the firearms] and that he delayed seeking treatment of his son in order to hide those two items." The district court did not clearly err in determining that this evidence, along with the fact that money and drugs were found in the street, indicated the transaction involved both drugs and guns. Moreover, the guns and drugs were found in close proximity to each other. See United States v. Martinez, 258 F.3d 760, 762-63 (8th Cir. 2001) (affirming application of enhancement where drugs were found in the living room and hall closet and firearm was found on top of wooden chest in dining room). The district court therefore did not err in applying the four-level enhancement to McGhee's sentence.

IV.

For the reasons stated above, we affirm the judgment of the district court.

_____