# In the Iowa Supreme Court

No. 24–0735

Submitted February 19, 2026—Filed April 24, 2026

**Matthew Lewis Hunter,**

Appellee,

vs.

**City of Des Moines, Iowa,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Paul D. Scott, judge.

The parties seek further review of a court of appeals decision that reversed a judgment in favor of the plaintiff on disability-discrimination and failure-to-accommodate claims and remanded for a new trial on the disability-discrimination claim. **Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Michelle Mackel-Wiederanders (argued) and Luke DeSmet, Assistant City Attorneys, Des Moines, for appellant.

David Albrecht (argued) of Iowa Employment Attorneys, P.L.C., West Des Moines, and Kellie L. Paschke and Kelly Verwers Meyers (until withdrawal) of Skinner & Paschke, P.L.L.C., West Des Moines, for appellee.

**Mansfield, Justice.**

### I. Introduction.

This highly contested case comes to us following a jury trial, a verdict for the plaintiff, and a 3–2 decision of the court of appeals. It involves a highly regarded police officer who suffered a mental health crisis after his best friend on the police force died by suicide. One night the officer drank excessively at a wedding celebration in another town, got into his vehicle to drive home, and then was arrested and had a series of confrontations with law enforcement. During those confrontations, the officer repeatedly invoked his status as a police officer and threatened to do physical harm or ruin the careers of those he engaged with. He also at times used misogynistic and homophobic language.

The officer was immediately remorseful for his misconduct and sought psychological help, which led to a diagnosis of post-traumatic stress disorder (PTSD) due to the colleague's suicide. But in the meantime, a disciplinary process went forward, and the police chief terminated the officer's employment the day after he disclosed his PTSD diagnosis. The officer then filed suit under the Iowa Civil Rights Act (ICRA), alleging discrimination on the basis of his PTSD disability. The officer maintained that he could have continued as a police officer with a reasonable accommodation and that he was terminated for having PTSD. The City responded that it terminated the officer because of his misconduct and that in any event he was no longer qualified to be an officer because of his PTSD.

Both sides presented substantial evidence in support of their positions, and we conclude that the officer's disability-discrimination claim was properly submitted to the jury. However, we agree with the thorough and well-reasoned majority opinion of the court of appeals which found that the jury's verdict was tainted by a novel jury instruction—not previously approved by us or in any other

reported decision—that redefined disability discrimination under the ICRA. We also agree with the court of appeals that the plaintiff's failure-to-accommodate claim fails as a matter of law. Accordingly, for the reasons stated herein, we affirm the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial on the plaintiff's disability-discrimination claim.

**II. Facts and Procedural History.**

**A. Sergeant Hunter's Record as a Police Officer.** Matthew Hunter began his career as a police officer in 2000 with the Des Moines Police Department (DMPD). Over time, Hunter received a series of sterling performance evaluations. His 2012 evaluation praised his demeanor and dependability and noted no deficiencies or areas for improvement. His 2014 evaluation was much the same, noting his positive engagement with Des Moines citizens and his willingness to volunteer for assignments. His 2015 evaluation described him as "an excellent officer" who "treats the public with respect." This pattern continued in later evaluations. Hunter's personnel file revealed numerous letters from citizens, thanking the DMPD for Hunter's services and expressing appreciation for actions he had taken that exceeded expectations. Hunter was promoted to Sergeant in May 2021, just before many of the events in this case took place.

**B. Sergeant Morgan's Suicide.** In September 2020, Hunter's former partner and best friend, Sergeant Joseph Morgan, took his own life with a firearm while seated in his car outside his home. Hunter received the news when he was at home with his family, having just completed his work shift. Hunter immediately drove over to Morgan's house. He arrived just after Morgan's body had been taken out of the vehicle and placed on the ground. Morgan's shirt had been removed, and the gunshot wound to his chest was visible.

Hunter spent a difficult night at the Morgan home and at the medical examiner's office. Nevertheless, he reported for his work shift the next day at 6 a.m. At roll call that morning, Chief of Police Dana Wingert briefly addressed the situation, allegedly saying, "By now you're all aware Officer Morgan has lost his life, we're never going to know why. We're not going to waste time trying to figure it out." Morgan did not receive the ceremonial honors reserved for officers who die in the line of duty or on the job—a course of action that Hunter viewed as callous and insensitive.

At the time of Morgan's suicide, DMPD had a policy in place that required all employees to "receive professional counseling when they are involved in incidents that result in serious injury or death to any person." Subject employees were required to "attend at least two (2) counseling sessions," the first of which was to occur "between 3–7 days after the event" and the second "not less than 30 days after the event, . . . if the officer has returned to work without any restrictions." Regardless of whether Morgan's suicide technically fell within this policy, the director of DMPD's peer support team recommended to Police Chief Wingert that any DMPD employees who were present at the scene be required to visit with Dr. Philip Ascheman, the staff psychologist.

**C. Aftermath of the Suicide.** Hunter initially sought counseling from a psychologist who was a private practitioner, Dr. David Grove. Hunter met with Dr. Grove about a week after Morgan's death, and Dr. Grove noted that Hunter was exhibiting symptoms of acute stress disorder. Acute stress disorder can be diagnosed within thirty days after a person experiences a traumatic event, whereas PTSD requires symptoms to have persisted for thirty days after trauma. Hunter did not inform DMPD or Dr. Ascheman of Dr. Grove's diagnosis, nor did he schedule a follow-up with Dr. Grove.

Hunter's session with Dr. Ascheman took place a few weeks later. Hunter later testified that he was "honest" but "careful" because he was aware that Dr. Ascheman worked for the City and was evaluating his fitness for duty. Hunter did not disclose that he had been diagnosed with acute stress disorder. Following his examination, Dr. Ascheman cleared Hunter for full duty.

Later in October, Hunter and his wife were having dinner at a friend's house when Sergeant Morgan came up in conversation. In discussing Morgan, Hunter became extremely emotional and began to cry inconsolably. The others present called Morgan's wife to have her talk to Hunter over the phone, but that only further distressed him. They next reached out to Hunter's supervisor, Sergeant Anthony Ballantini, who came over and helped to calm Hunter down. The two talked through what Hunter was experiencing. Both agreed they could benefit from counseling, but they did not follow up. Hunter avoided informing any command staff of the incident because he didn't want it to interfere with his ability to be promoted to sergeant.

On May 31, 2021, Hunter and a colleague responded to the death by suicide of an elderly veteran. Like Sergeant Morgan, this man had taken his own life with a firearm. The colleague described Hunter's demeanor as sometimes engaged and sometimes gazing off into the distance, disengaged. At one point, Hunter went into another room in the house and the colleague followed Hunter to check on his mental state and ask if he was okay. Hunter's response was defensive: "Yeah, why?"

Still emotional after leaving the scene of the veteran's suicide, Hunter returned to the police station. Yet he soon proceeded to the cemetery where Sergeant Morgan had been buried. There he encountered Morgan's wife and daughter visiting the gravesite.

**D. The Events of June 5–6, 2021.** Less than a week later, on the evening of Saturday, June 5, Hunter attended a relative's wedding celebration in Indianola. While there, he drank a lot of whiskey. At one point, other guests began to use marijuana. Not wanting to be present for that behavior, Hunter took steps to leave the party. It was now shortly after midnight.

Hunter entered his car and began to drive away. Hunter's wife, knowing her husband shouldn't be driving due to his alcohol consumption, ran up behind the car and began to bang on the tailgate. Hunter stopped the car, and his wife hopped in and tried to take the keys from him.

Sergeant Justin Keller of the Indianola Police Department happened to be passing by in his vehicle on patrol. Believing that there may have been a domestic dispute between Hunter and his wife, Keller pulled his police vehicle next to the driver's-side door. Hunter's wife got out of the car and told Keller that her husband was a Des Moines police sergeant, that he had had too much to drink, and that she was trying to stop him from driving. Keller then went to speak to Hunter to try to resolve the situation.

From the start, Hunter was belligerent and combative. He repeatedly hurled profanity and insults at Keller and at the other officers who arrived soon thereafter. Hunter asked Keller what probable cause he had to stop him and yelled over Keller's questions. As the other officers showed up, Hunter exited his car, defying an officer's instruction to remain in his vehicle.

Keller attempted to ask Hunter where he'd come from and whether he would be willing to go back there. Instead of answering, Hunter moved toward Keller. When Keller directed Hunter to move back, Hunter asked Keller if he wanted to fight. As the officers attempted to de-escalate, Hunter continued to swear at the officers: "You think I'm in your fuckin' face? Fuck you!" "You wanna

fuck with me dude? I'll fuck with you." In addition to confronting and cursing at the officers, Hunter used crude, misogynistic language toward them.

At this point, Keller decided that arresting Hunter was his only option, and he instructed Hunter to turn around and put his hands behind his back. When Hunter refused, Keller grabbed him by the arm and forcibly turned him around. As Hunter was being arrested, he told Keller, "You just fucked your career, dude." When Hunter was placed in Keller's cruiser, he continued, "What the fuck are you doing? Are you fucking kidding me? Wow, dude, are you fucking kidding me, is that how you treat a fucking cop? What the fuck dude? Are you fucking out of your fuckin' mind?" This verbal abuse continued during the transit to the Warren County Jail. Hunter stated, "I am a fucking sergeant at the Des Moines Police Department. You all are going to lose your jobs."

Hunter was initially booked at the Warren County jail but then had to be transferred to the Marion County jail. During the trip to Marion County, Hunter became even more pugnacious. He told the transporter: "I am going to fuck your life up you messed with the wrong person" and "I will kill you and your family." He repeatedly used misogynistic and homophobic language. At times, though, Hunter was crying and lying down on the floor of the van.

At the Marion County jail, Hunter told the detention officer that he would "not forget" him. The officer took that statement as a threat. Hunter reiterated that the officer who had arrested him would be "fucked" if he ever came to Des Moines. Yet in other moments, Hunter was crying and despondent. Hunter consented to a breathalyzer test which returned a blood alcohol concentration of .21%.

Hunter was charged that night with public intoxication, a simple misdemeanor. He later acknowledged that he could have been charged with other crimes as well.

**E. The Disciplinary Process.** Hunter was released from jail later on Sunday morning. The next day, Hunter was placed on administrative leave pending the outcome of an internal investigation.

On June 8, Hunter sent an email to DMPD Chief Wingert, DMPD Assistant Chief Alan Tunks, and David Button, Chief of Police of the Indianola Police Department. In that email, Hunter expressed his apologies to the DMPD and the Indianola Police Department, as well as to the police officers who had responded to the incident on June 5–6.

Later on the afternoon of the 8th, Hunter met with DMPD's office of professional standards (OPS). During that interview, Hunter watched the dashcam footage of his arrest and was informed of some of the statements he had made. He stated that he had virtually no memory of anything that he had said, responding with shock and contrition. After the OPS concluded its investigation, it passed along its findings to Captain Lillie Miller (Hunter's supervisor) and Assistant Chief Tunks. Both formally recommended to Chief Wingert that Hunter's employment be terminated.

Hunter sent another email to Wingert and Tunks on June 9. In it he informed them that he'd scheduled two counseling appointments. He added, "I have struggled with the trauma of [Sergeant Morgan's] death, and this now spilled over into all aspects of my life." He again apologized "to everyone involved who has been negatively impacted by this."

Hunter wrote another email to Chief Wingert on June 12. Hunter addressed any homophobic statements he may have made and assured the chief

that they were inconsistent with his personal beliefs and values. In that same email, he told Wingert that he believed the arrest incident was related to trauma he had experienced after Sergeant Morgan's death. He stated that he had "needed to get help for the trauma" and was now in the process of doing so.

Hunter requested review of his recommended termination by a DMPD guidance committee. This panel was comprised of three officers—one sergeant selected by Hunter and a sergeant and a lieutenant selected by Chief Wingert. Hunter testified before the committee on June 23 and generally took responsibility for his actions. He pointed out that since his arrest, he had learned that he had experienced symptoms of PTSD, although he had not yet been diagnosed with PTSD. The colleague who had been with Hunter on May 31 told the committee about his observations of Hunter at that suicide scene. Following the hearing, the committee voted 2–1 to confirm the recommendation for Hunter's termination. Hunter's designee on the committee proposed an alternative resolution: a thirty-day suspension, a mandatory "Fit For Duty" test, and a requirement that Hunter receive treatment for PTSD and alcoholism.

On June 28, Hunter exercised his right to a pre-disciplinary meeting with Chief Wingert with other officers present, including an advocate for Hunter. At the meeting, Hunter again took responsibility for his behavior and apologized. He informed Wingert that he had been diagnosed with PTSD by Dr. Grove. Acknowledging that others involved in the disciplinary process had recommended termination, Hunter nonetheless requested "more time" and "a second chance." He told the chief that he thought his experience could help other officers dealing with similar issues.

Wingert told Hunter that he had received and read all of Hunter's emails, some emails from others expressing support for Hunter, and the

recommendations of the OPS and the guidance committee. He then told Hunter that his decision was "probably not something that's going to happen in the next day or two." He assured Hunter that he would "take [his] time and go through . . . and consider everything in [those materials]." He told Hunter he couldn't "necessarily pin down a timeframe" for when he'd reach his decision, that it "may be this week, maybe not," but that "it certainly won't be . . . in the next day or two" because he'd "need more time than that." He told Hunter that he wanted to "start fresh and go through the entire thing," and "consider everything, including our conversation today."

The following day, June 29, Hunter was notified that his employment had been terminated effective that day.

**F. District Court Proceedings.** After exhausting his remedies with the Iowa Civil Rights Commission, Matthew Hunter filed this action in the Polk County District Court against the City of Des Moines, alleging violations of the ICRA. The case proceeded to trial on two claims. First, Hunter alleged that the City had discriminated against him on the basis of disability by discharging him due to his PTSD. Second, Hunter alleged that the City had failed to provide a reasonable accommodation for his PTSD, specifically, time for him to improve his mental health.

At trial, Hunter offered evidence of relatively lenient discipline meted out by DMPD in other disciplinary cases. Those comparator cases involved officers who did not have disabilities and were not terminated, although none involved an officer who used their status as a police officer to threaten other law enforcement personnel with loss of a job or physical harm if they carried out their responsibilities.

One comparator concerned an officer whose intimate partner, also a DMPD employee, was under investigation for criminal mischief in another jurisdiction. The officer went to the other jurisdiction and demanded a copy of the relevant surveillance video. He claimed that the police department in the other jurisdiction was targeting the wrong person, and asserted that the other police department had a reputation for doctoring videos. The officer received a citation for nonfelonious misconduct in office that was dismissed. Chief Wingert imposed a three-day suspension.

Other comparators related to officers who, while off-duty, consumed excessive alcohol and got into fights. These officers typically received reprimands or suspensions of at most a few days, even when they had prior disciplinary records.

Yet another comparator involved an officer who was accused of repeated sexual harassment and, by one female co-employee, of nonconsensual sex. A female lieutenant investigated the claim of nonconsensual sex and classified it as nonsustained: "Insufficient evidence exists to prove or disprove the allegations." The officer also received a complaint for referring to people attending an LGBTQ+ event as "[j]ust a bunch of clowns." This officer received a reprimand.

Another comparator involved an officer who received a series of short suspensions for numerous violations of the use-of-force policy, particularly misuse of pepper spray.

To counter this evidence, Chief Wingert testified about other DMPD employees in addition to Hunter who were terminated for misconduct or resigned in lieu of termination. All but one of these employees had engaged in sexually harassing conduct. One, for example, had sent photos of his genitalia to other

officers, coworkers, and members of the public. The remaining employee had an "abysmal" record and was on a "last chance letter" when he was terminated.

After five days of evidence, the case was ready for submission to the jury. The district court overruled the City's motions for directed verdict. It also rejected the City's objection to an instruction on stereotypes. The objected-to instruction authorized the jury to find unlawful discrimination if the City's decisionmakers treated Hunter differently than they would have treated him if he had not had a disability, even if those decisionmakers were "unaware of bias in [their] thinking" and did not "realize their own motives." The district court also turned down the City's requests for certain additional instructions.

The jury returned verdicts finding the City liable on both claims. Hunter received over $2.6 million in backpay, frontpay, and emotional distress damages. After denying the City's posttrial motions, the district court also awarded Hunter over $426,000 in attorney fees.

**G. This Appeal.** The City appealed, reurging the same issues it had raised in its posttrial motions. We transferred the case to the court of appeals.

The court of appeals heard the City's appeal as a five-member panel and rendered a 3–2 decision. The majority concluded that the evidence supported the jury's verdict with respect to disability discrimination. In its view, there was sufficient evidence in the record that Hunter was qualified for his job as a police sergeant and that his PTSD was a motivating factor in his termination. Yet the majority also found that a new trial was required on the disability-discrimination claim because that verdict was tainted by the "stereotypes" instruction, which "negated the intentionality requirement for a disparate-treatment claim and undermined the well-established motivating-factor standard."

The majority further held that the City was entitled to judgment as a matter of law on the reasonable-accommodation claim. It concluded that Hunter had never requested an accommodation for his PTSD prior to his June 5–6, 2021 misconduct—at which point it was too late. Thus, the majority reversed and remanded for a new trial limited to the disability-discrimination claim.

Two members of the panel dissented. They would have upheld the jury verdict and the district court judgment, reasoning that Hunter had made a timely request for an accommodation and that the stereotypes instruction was a correct statement of discrimination law.

Both parties requested further review, which we granted.

**III. Standard of Review.**

"We review district court rulings on motions for directed verdict and judgment notwithstanding the [verdict] 'for the correction of errors at law.'" *Selden v. Des Moines Area Cmty. Coll.*, 2 N.W.3d 437, 443 (Iowa 2024) (quoting *Godfrey v. State*, 962 N.W.2d 84, 99 (Iowa 2021)). "When considering a jury verdict, 'we "view the evidence in the light most favorable to the party against whom the motion is made." ' " *Id.* (quoting *Godfrey*, 962 N.W.2d at 99).

"We review alleged errors in jury instructions for correction of errors at law." *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (quoting *Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006)). "A court's instructions to the jury 'must convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide.'" *Boyle*, 710 N.W.2d at 748–49 (quoting *Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997)). "Reversal is generally required in cases where an instruction is confusing or conflicting." *Id.* at 749.

**IV. Analysis.**

**A. Disability Discrimination.** The ICRA makes it "an unfair or discriminatory practice . . . to discharge any employee . . . because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(*a*) (2022). "The ICRA 'only pronounces a general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute.' " *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 22 (Iowa 2021) (quoting *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003)).

"To prevail on a disability discrimination claim under the ICRA, [the plaintiff] must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of [the position], and (3) the circumstances of his termination raise an inference of illegal discrimination." *Id.* (quoting *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014)). If the plaintiff establishes a prima facie case, the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the discharge, whereupon the employee must show that the disability was "a motivating factor in the employer's decision to take an adverse action against him." *McClure v. E.I. du Pont de Nemours & Co.*, 23 N.W.3d 33, 41 (Iowa 2025).

In this case, the parties agreed that Hunter had a disability, but disputed whether Hunter was qualified to perform the functions of a police officer. Also, the City presented a legitimate, nondiscriminatory reason for Hunter's termination—namely, his misconduct on June 5–6—so Hunter was required to show his disability was at least a motivating factor in his termination. Further, under our precedent, the City could prevail if it proved "that it would have made

the same decision even if it had not taken the plaintiff's [disability] into account." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (plurality opinion), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (codified at 42 U.S.C. §2000e-5(g)(2)(B))); *see also Rumsey*, 962 N.W.2d at 31 ("As instructed, the jury had to consider whether [the manager] would have made the same decision despite the request for [accommodation] . . . .").

Accordingly, the district court instructed the jury on the issues of whether Hunter was qualified for the position and whether his disability was a motivating factor in the decision to terminate him. Also, the district court submitted a special verdict on whether the City proved "it would have made the same decision to terminate [Hunter's] employment regardless of his disability." The jury returned a verdict in favor of Hunter on the disability-discrimination claim and answered no to the same-decision interrogatory. The City argues that there was insufficient evidence on (1) whether Hunter was qualified and (2) whether his disability was a motivating factor in his termination, so the disability-discrimination claim should not have gone to the jury.

1. *Whether Hunter was qualified.* In order to establish that he was qualified, Hunter needed to prove that, with or without a reasonable accommodation, he could "perform the essential functions of the position in question without endangering the health and safety" of himself or others. *Boelman v. Manson State Bank*, 522 N.W.2d 73, 80 (Iowa 1994) (quoting 29 C.F.R. § 1613.702(f) (1993)). "The 'essential functions' of the job are those that 'bear more than a marginal relationship to the job at issue.' " *Goodpaster*, 849 N.W.2d at 14 (quoting *Boelman*, 522 N.W.2d at 80). "Whether an individual is qualified for a particular job, despite his or her disability, requires an

individualized inquiry." *Id.* at 15 (quoting *Courtney v. Am. Nat'l Can Co.,* 537 N.W.2d 681, 685 (Iowa 1995)).

The City maintains that Hunter's PTSD meant that he was no longer qualified to be a police sergeant. As the United States Court of Appeals for the Eighth Circuit has put it, "[T]he risk of an armed patrol officer being unable to function in an emergency situation is not a risk we are prepared to force a police department to accept." *Burroughs v. City of Springfield,* 163 F.3d 505, 508 (8th Cir. 1998).

The City points to its own job descriptions to demonstrate Hunter's lack of essential qualifications. The job description for a police officer requires the individual to

> Work under highly stressful and emotional conditions. Maintain control of emotions; keep personal feelings to self. Use sound judgment in emergency situations. Maintain intense concentration and alertness during stressful situations.

The job description for a sergeant indicates that the individual must possess the qualifications of a police officer and also have the "[a]bility to work in chaotic and dangerous situations while maintaining control over one's emotions and composure" and the "[a]bility to work in situations involving confusion and potential danger to oneself, citizens, or another Police Officer and to make quick decisions which secure the safety of all individuals involved."

The City also points to the trial testimony of Dr. Grove and Hunter. Dr. Grove testified that symptoms of PTSD include memory loss, extreme irritability, angry outbursts without apparent provocation, mood swings, alcohol use, and self-destructive behavior. Those symptoms "don't just magically go away"; Dr. Grove agreed that Hunter would continue to experience them. Dr. Grove acknowledged that Hunter's PTSD—when triggered—could result in a

situation where he was simply out of control. He also testified that Hunter's PTSD could be triggered by being exposed to danger, by holding or being exposed to guns, or even by reviewing police reports that involved traumatic events. Further, Hunter's judgment about when to use lethal force could be affected by his PTSD. Dr. Grove stated that improvement of PTSD symptoms is generally not linear or predictable on a day-to-day basis.

Hunter admitted that when he was terminated in June 2021, he would have needed time before he could get back to work, and he did not know how much time. He acknowledged that in 2022 he was having nightmares related to the violence he observed while working as a police officer. Even in 2023, Hunter was continuing to have anxiety, depression, and flashbacks. He wasn't sure whether he would be able to work as a police officer given his PTSD symptoms.

The City cites federal caselaw to support its contention that Hunter's PTSD disqualified him from working as a police officer. Its principal authority is *McKenzie v. Benton*, 388 F.3d 1342 (10th Cir. 2004). In that case, a sheriff declined to rehire a deputy who had previously resigned after experiencing several psychological crises, including firing her weapon at her father's gravesite and undergoing multiple hospitalizations. *Id.* at 1345–46. The district court initially granted summary judgment for the sheriff. *Id.* at 1345. The United States Court of Appeals for the Tenth Circuit reversed, concluding that factual disputes required a trial on whether she was qualified in light of her disability. *See McKenzie v. Dovala*, 242 F.3d 967, 973–75 (10th Cir. 2001). At trial, the jury found for the defendant. The Tenth Circuit affirmed. *McKenzie*, 388 F.3d at 1356.

*McKenzie* actually underscores that a diagnosis of PTSD does not necessarily render a law enforcement official unqualified to do their job. The Tenth Circuit declined to resolve qualification as a matter of law based solely on

diagnosis and instead required a trial. *See also Hoback v. City of Chattanooga*, 550 F. App'x 257, 260 (6th Cir. 2013) (affirming a jury verdict in favor of a police officer on a disability-discrimination claim where the officer had PTSD and had failed a psychological fitness-for-duty test before being terminated but two subsequent psychological evaluations concluded that the plaintiff could perform the duties of an officer). *But see Johnson v. City of Blaine*, 970 F. Supp. 2d 893, 909–10 (D. Minn. 2013) (granting summary judgment to the defendant where was no contrary evidence and "[b]ased on the 2010 Fitness for Duty Report, issued by an objective medical professional after a thorough and individualized assessment, Johnson was a direct threat to the safety of herself and others," and adding that "it is undisputed that Johnson had an extensive history of suicide ideation, and her position required her to be armed with a firearm").

As summarized by the court of appeals, there was evidence that Hunter was still qualified to perform the essential functions of a police officer:

> For approximately six months after Sergeant Morgan's death, Hunter continued to successfully perform his police functions while privately coping with his mental-health struggles. On the one occasion he experienced PTSD symptoms while at work—the scene of the May 31 suicide—he managed his emotions by collecting himself in another room. The City's own psychologist concluded Hunter was fit for duty in October 2020. And perhaps most importantly, Chief Wingert agreed that Hunter was capable of performing the functions of a sergeant when he was promoted less than a month before his arrest.

Further, Hunter introduced a good deal of evidence that losing his job in June 2021 *aggravated* his PTSD. His support system within the police force—his "family"—vanished. As Dr. Grove put it, due to the termination, Hunter's "symptoms were more frequent, and the duration of the symptoms was longer, and his ability to control the symptoms was reduced." Still, by the time

of trial, Hunter testified that "with the ongoing counseling that [he had] been receiving that [he] would be able to fulfill" the duties of a police officer.

Additionally, there was evidence that Hunter could have been reassigned to other job responsibilities. *See* Iowa Admin. Code r. 161—8.28 (2022) ("When an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist that individual's rehabilitation."); *Rumsey*, 962 N.W.2d at 23 ("[I]f an employee is unable to return to his former job, we look next to whether other jobs existed that he could perform with or without accommodation."). While "an employer need not create a new job as an accommodation for disability discrimination purposes," *id.* at 16, Chief Wingert testified at trial that there were sergeant positions within the administrative services division of the DMPD that Hunter could have been transferred to. The jury was instructed that for purposes of the disability-discrimination claim, Hunter had to be able to perform the essential functions of a police officer "with or without reasonable accommodations." It was also instructed that such accommodations included "[r]otating employee job duties or roles." Accordingly, a reasonable jury could have found that Hunter was a qualified person. This element was properly submitted to the jury.[1]

2. *Whether Hunter's disability was a motivating factor in the City's termination of his employment.* The City next argues that there was insufficient evidence to demonstrate that Hunter's disability was a motivating factor in his

---

[1]The City also maintains that Hunter's *misconduct itself* meant that he was no longer qualified to perform the duties of a DMPD police officer. But we agree with the court of appeals that this argument is just another way of asking us to review the City's motives for terminating Hunter's employment. We address that subject later in this opinion.

termination. "Discrimination is a 'motivating factor' in an adverse action if an employee's status as a member of a protected class 'played a part' in the employer's decision." *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 582 (Iowa 2017) (quoting *DeBoom*, 772 N.W.2d at 12). The discriminatory motive "need not have been the only reason for Defendant's actions." *DeBoom*, 772 N.W.2d at 13. Here, Hunter's termination came one day after he disclosed his PTSD diagnosis to the DMPD. *See Rumsey*, 962 N.W.2d at 33 ("While temporal proximity is generally insufficient alone to establish the causal connection, Rumsey was fired within hours of requesting an interpreter . . . ."). Hunter also presented evidence of a stigma associated with mental health issues within the DMPD.

It is true that Hunter engaged in serious misconduct. On the night of June 5–6, he repeatedly misused his status as a DMPD police officer to threaten other law enforcement personnel. Some later told the jury they didn't feel threatened, but the statements were made. "Although an employer is prohibited from discharging an employee based on a disability, an employer is not prohibited from discharging an employee based on misconduct, even if that misconduct is related to his disability." *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 149 (3d Cir. 2018); *see also Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1217 (11th Cir. 2021) ("We recognize that Todd's behavior, including the threats she allegedly made, likely stemmed from her major depressive disorder. But that does not mean the District's proffered reasons for declining to renew Todd's contract were discriminatory: the record does not support the proposition that the District declined to renew Todd's contract because she had been diagnosed with major depressive disorder."); *Halpern v. Wake Forest U. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) (holding that

misconduct related to a disability may be a ground for dismissal); 2 *Americans with Disabilities: Practice & Compliance Manual* § 7:183 Westlaw (database updated Nov. 2025) ("Under most jurisdictions, a disabled person or a person regarded as disabled is not immunized from an adverse employment action, and such person may still be disciplined or terminated for misconduct even if the misconduct is precipitated by a disability, such as alcoholism or mental illness." (footnote omitted)). It is also true that a recommendation had already been made to terminate Hunter before he disclosed his PTSD diagnosis.

But Hunter introduced a good deal of comparator evidence and effectively cross-examined Chief Wingert using that evidence. A jury could have concluded that DMPD normally had a high tolerance threshold for off-duty, alcohol-fueled misbehavior.[2]

We hold comparator evidence to a "rigorous" standard, requiring the plaintiff to "identify a comparator employee 'who committed an offense of comparable seriousness' but did not suffer the same adverse employment action." *McClure*, 23 N.W.3d at 46 (quoting *Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 350 (Iowa 2023)). Yet this case does not resemble either *McClure v. E.I. du Pont de Nemours & Co.*, 23 N.W.3d 33, or *Feeback v. Swift Pork Co.*,

---

[2]The City objected to the admissibility of most of Hunter's comparators. However, we do not believe the district court abused its discretion in admitting this evidence. Generally speaking, the comparators covered approximately the same period, the decisionmaker was Chief Wingert, and a jury could have deemed the misconduct of equal seriousness. Significantly, the City had the opportunity to rebut these comparators with evidence of other individuals without disabilities who were dismissed from the DMPD.

As a sidenote, we conclude that the City preserved error on its objections to most of the comparator evidence. During trial, before Chief Wingert was to take the stand, the district court ruled that it would allow the comparator evidence "unless somehow during direct or cross something comes up . . . but I don't know what that would be." The district court noted that the City had objected to six of the seven comparators. However, the court found that the other employees were "similarly situated with[in] the police department," Chief Wingert had participated in all the disciplinary decisions, and the conduct was "maybe not as severe [as Hunter's] for some and worse for others," but the law did not require the conduct to be identical.

988 N.W.2d 340, in which we criticized the plaintiff's selection of comparators. In *McClure*, the plaintiff had a history of safety violations and had been effectively given a final warning, unlike the so-called comparators. 23 N.W.3d at 39, 46. In *Feeback* the plaintiff had texted "FUCK YOU" to his boss, unlike the supposed comparators who had merely used profanity in the workplace. 988 N.W.2d at 350–51. In the present case, by contrast, the jury had an opportunity to weigh comparators of varying degrees of seriousness, including examples offered by the City where the employee was not disabled and was terminated.

Moreover, Chief Wingert didn't deliberate for days on the decision to terminate Hunter as he had promised he would; he fired him the next day. A jury might infer that, having become aware of Hunter's PTSD, Wingert wanted to avoid a drawn-out decision that might have brought PTSD concerns even more to the surface. We hold that Hunter presented sufficient evidence to generate a jury question on motivating factor.

**B. Failure to Accommodate.** We turn now to the failure-to-accommodate claim. This claim required Hunter to prove that "he was a qualified individual, his employer knew of his disability, he requested a reasonable accommodation, and he suffered an adverse employment action." *Rumsey*, 962 N.W.2d at 22.

We believe the court of appeals got to the heart of the matter here. Following Hunter's arrest, both Hunter's superiors and the guidance committee recommended that his employment be terminated. The final step before termination was the pre-disciplinary meeting with Chief Wingert on June 28. There Hunter disclosed his PTSD diagnosis and said that he needed time and treatment to get back to working as before.

We agree with the court of appeals that this was the *first* time Hunter requested an accommodation for his disability. His accommodation argument at

trial centered entirely on the June 28 meeting with Chief Wingert. As Hunter's counsel argued in closing:

> Nothing stopped [Chief Wingert] on June 28 when he had Matt [Hunter] in the room and Matt is begging for his support. He could say, "Matt, let's talk about it. You said you needed time. How much do you think? How much do you need?" Conversation never happened.

And again in rebuttal:

> Instruction 20, that's the reasonable accommodation charge, the marshaling instruction. They admit that Matt said, "Hey, I may need some time." So that element is just proven that he requested that. Okay. Fine. And they didn't give that to him. We know that's true. They admitted it. They say, "Oh, it was indeterminate." They never asked him. That's the purpose of the [interactive] process.

And on appeal, Hunter highlights the following testimony from Chief Wingert concerning June 28:

> Q. June 28, Chief, at that point you could have called [Hunter] and said, "Hey, let's explore these ways to reasonably accommodate your disability." Could have done that?
>
> A. Could have.

We reaffirm what we recently said in *Rumsey*—that seeking an accommodation after engaging in terminable misconduct is too late:

> [A]n employee who engages in terminable conduct cannot avoid the consequences of his actions by then requesting an accommodation for those actions. *See, e.g.*, *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) ("[L]iability is not established where 'an employee engages in misconduct, learns of an impending adverse employment action, and then informs his employer of a disability that is the supposed cause of the prior misconduct and requests an accommodation.'" (quoting *Schaffhauser v. United Parcel Serv., Inc.*, No. 4:12-cv-00599 KGB, 2014 WL 197684, at *10 (E.D. Ark. Jan. 15, 2014), *aff'd*, 794 F.3d 899 (8th Cir. 2015))); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (holding a request for an accommodation by a bus driver, after she fell asleep twice while on the job, was untimely because the request was made after she engaged in terminable misconduct).

*Rumsey*, 962 N.W.2d at 31.

Federal caselaw and administrative guidance support the views we set forth in *Rumsey*. *See Shock v. Webster Indus., Inc.*, No. 24-3944, 2025 WL 3083072, at *4 (6th Cir. Sep. 16, 2025) ("[B]ecause Shock had already committed the misconduct that Webster cited as the reason for his termination and had not previously requested additional accommodations, the company was not required to rescind Shock's termination or engage in further discussion of his accommodation request."); *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 65–66 (1st Cir. 2020) (noting that the employee requested an accommodation only after it became clear that an adverse employment action was imminent and "[n]othing in the ADA demands that an employer accord an employee—even an employee with a disability—such a second chance"); *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017) ("[A] denied request for retroactive leniency cannot support an accommodation claim . . . ."); EEOC, *Applying Performance and Conduct Standards to Employees with Disabilities* (Sep. 3, 2008) (stating that "[i]f an employee states that her disability is the cause of the conduct problem or requests accommodation, the employer may still discipline the employee for the misconduct. If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation" and that "[w]hen an employee does not give notice of the need for accommodation until after a performance problem has occurred, reasonable accommodation does not require that the employer . . . withhold disciplinary action (including termination) warranted by the poor performance."), https://www.eeoc.gov/laws/guidance/applying-performance-and-conduct-standards-employees-disabilities [https://perma.cc/V4TV-YRKK].

Hunter cites no law to the contrary. Rather, he points out that the City had notice of his PTSD before June 28. The record supports this to some extent, but there is nothing in the record to suggest Hunter sought any kind of accommodation before the 28th. Hunter also quotes a United States Supreme Court opinion in a Title VII religious discrimination case where the Court said, "A request for accommodation . . . may make it easier to infer motive, but is not a necessary condition of liability." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). We agree with the Supreme Court's observation, but it goes to Hunter's *other* claim—i.e., that the City terminated Hunter's employment because of his disability. We affirm the court of appeals' ruling that a directed verdict should have been granted for the City on Hunter's reasonable-accommodation claim.

**C. Instructional Issues.** Having determined, like the court of appeals, that Hunter presented sufficient evidence on his disability-discrimination claim but insufficient evidence on his failure-to-accommodate claim, we turn now to the question of whether an error in the jury instructions requires a new trial on the disability-discrimination claim.

1. *The stereotypes instruction.* The City challenges Jury Instruction No. 26, which read in its entirety as follows:

> Unlawful discrimination sometimes happens without the decisionmaker having planned, thought out, or even acknowledged to himself or herself that it is taking place. The law acknowledges the effects of society's stereotypes on employers in their decision making, and that biased decision making based upon those stereotypes can violate the law, even if the decisionmaker is unaware of bias in his or her thinking. This is because the law's purpose is to eradicate discrimination in all forms, regardless of the personal character of the individuals making discriminatory decisions.

> If you find from all the surrounding circumstances that Defendant treated Matthew Hunter differently than they would have

if he had not had a disability or if he had not requested a reasonable accommodation—even if the managers do not acknowledge or realize their own motives—you may find in favor of Mr. Hunter.

Hunter proposed this instruction. The City objected to it, arguing:

> We don't think that the stereotype instruction should be given. It implies to the jury that the City could be held liable for its actions even if it didn't know that it was terminating Matthew Hunter for his posttraumatic stress disorder. That's inconsistent with the motivating factor instruction, . . . which says that his disability has to have played at least a part in the decision to terminate him.

> So suggesting to the jury that the decisionmakers need not have considered Matt Hunter's disability and they could be held liable for unintentionally firing him because of his disability, we think, is inconsistent with the motivating factor instruction and prejudicial to the City.

We agree with the court of appeals that this objection should have been sustained. To prevail on his disparate-treatment claim, Hunter had to prove that he suffered intentional discrimination because of his disability. *See Pippen v. State,* 854 N.W.2d 1, 9 (Iowa 2014) ("In a disparate treatment case, the plaintiff bears the burden of showing he or she has been harmed by discriminatory animus of the employer."); *see also Iowa C.R. Comm'n v. Woodbury Cnty. Cmty. Action Agency,* 304 N.W.2d 443, 451–52 (Iowa Ct. App. 1981) (rejecting a plaintiff's argument "that, under Iowa law, proof of intent to discriminate" is not required to prove a disparate-treatment claim). An employer who is "unaware of bias"—the paradigm of Instruction No. 26—normally can't be engaging in intentional discrimination.

Hunter argues that it is "vital that juries be educated on the existence of stereotypes." But this instruction did the opposite. It was a confusing and somewhat contradictory mix-and-match of different concepts.

For one thing, we don't instruct juries on "the law's purpose," as Instruction No. 26 did. We instruct them on *what the law is.* And the ICRA does

not "eradicate discrimination in all forms." Rather, as relevant here, it prohibits certain types of discrimination, specifically discharging an employee who was otherwise qualified because of their disability. *See* Iowa Code § 216.6(1)(*a*). Instruction No. 26 thus invited the jury to hold the City liable if it engaged in any form of discrimination.

In addition, the instruction advised the jury that if they found the City had treated Hunter "differently than they would have if he had not had a disability," that would be enough to find in favor of Hunter. But that statement was an oversimplification. It disregarded the points that (1) Hunter had to have been discharged because of his disability, as opposed to the misconduct caused by the disability, and (2) Hunter also had to show he was still qualified to perform the essential functions of the position—as discussed in part IV.A of this opinion.

Also, the instruction's discussion of stereotypes was perplexing rather than edifying. The instruction told the jury that "biased decision making based upon those stereotypes can violate the law," but it didn't explain how it would violate the law. Here, the City could be subject to liability if Chief Wingert fired Hunter *because* Wingert held a stereotypical view that police officers with PTSD couldn't do their job, *if* in fact Hunter could do the job. But those qualifiers were omitted from the instruction, and Hunter's counsel exploited that omission during closing argument:

> You heard the stereotypes. Chief might really believe that folks with PTSD are unfit to be cops. That doesn't make it any less illegal. You run a red light on purpose or on accident and you hurt somebody, you're still on the hook.

That isn't correct. Merely believing that someone with PTSD is unfit to be a cop would not be illegal unless all the elements of a disability-discrimination claim were proven.

Hunter relies on the following statement that we made in *Palmer College of Chiropractic v. Davenport Civil Rights Commission*, 850 N.W.2d 326, 333 (Iowa 2014), reading the federal law that often guides our interpretation of the ICRA: "Both the ADA and the Rehabilitation Act specifically prohibit discrimination against those with disabilities based not just on 'affirmative animus,' but also any discrimination based on thoughtlessness, apathy, or stereotype." But we agree with the court of appeals that Hunter takes that statement out of context. The point we were making was that a disability-discrimination claim doesn't require the defendant to be overtly hostile toward people with the plaintiff's disability; the defendant could be aware of the disability and violate the law out of "thoughtlessness, apathy, or stereotype." *Id.* Still, as *Palmer* indicates, there would have to be "discrimination" in the first place, *id.*; what we said in *Palmer* does not relieve the plaintiff from proving the elements of a discrimination claim.

Nor do Hunter's other citations to authority support the giving of Instruction No. 26. In *Stacks v. Southwest Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1324 (8th Cir. 1994), the Eighth Circuit asked whether the plaintiff had presented "evidence, be it direct or circumstantial, sufficient to support a finding by a reasonable fact finder that [gender] actually motivated the challenged decision." *Id.* at 1323–24 (alteration in original) (quoting *Stacks v. Sw. Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n.1 (8th Cir. 1993) (per curiam)). The court explained that such proof may include "actions or remarks of the employer that reflect a discriminatory attitude" and "[c]omments which demonstrate a discriminatory animus in the decisional process, or those uttered by individuals closely involved in employment decisions." *Id.* at 1323 (alteration in original) (quoting *Stacks*, 996 F.2d at 202–03). Nothing in *Stacks* suggests a jury may

impose liability based on unrecognized or unconscious motives. *Stacks* simply allows a jury to infer actual discriminatory motivation from circumstantial evidence.

In *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1064 (8th Cir. 1988), the Eighth Circuit stated that "[a]ge discrimination is often subtle and 'may simply arise from an *unconscious* application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce.' " (Quoting *Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 154–55 (7th Cir. 1981), *overruled in part on other grounds by*, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir. 1988)). But *Brooks*, like *Stacks*, was actually a conventional discrimination case. The Eighth Circuit went on to explain its ruling and agreed with the district court that "[t]he jury may well have concluded that [Woodline] terminated [Brooks] because it acted on a stereotype that he was not as likely to supply the same vigorous, on-the-street sales activity as might be expected from a younger person." *Id.* (second and third alterations in original) (quoting *Brooks v. Woodline Motor Freight, Inc.*, No. 85–0668–CV–W–6, slip op. at 1 (W.D. Mo. Sept. 24, 1986)). In other words, the defendant terminated the plaintiff because of his age based on a stereotypical view that a person of that age could not perform the job as well. In its discussion of stereotypes, *Brooks* provides the necessary refinements that Instruction No. 26 lacked.

In *Moe v. Grinnell College*, 556 F. Supp. 3d 916, 932 (S.D. Iowa 2021), the district court said, "The use of biased perspectives or stereotypes in Title IX proceedings is sufficient for a reasonable jury to infer discrimination on the basis of sex." But *Moe* is far afield from the present case. That case involved a male college student who alleged that the college violated Title IX in disciplining him for nonconsensual sexual contact with two female students, and specifically that

he was treated more harshly than a female student would have been. *Id.* at 929. He presented evidence that a female student had not been disciplined in similar circumstances involving alleged nonconsensual sex with another female student. *Id.* at 931–32. The plaintiff also presented evidence that the adjudicator of the discipline, who was the same in both cases, drew conclusions about his behavior that she had not previously drawn about the female respondent in the prior case. *Id.* at 932. In the court's words: "Although[] other factors may explain the difference in treatment, the case framework and opinion language suggest the respondent's sex could have played a role in the adjudicator's differing assessments of the 2015 case and Moe's case." *Id.* Given this and other considerations, the district court denied the college's motion for summary judgment. *Id.* at 933. *Moe* thus involves the specific circumstance where the decisionmaker issued written decisions in two similar cases—one involving a male student and the other involving a female student—enabling the trier of fact to directly compare the decisionmaker's thought process.

In *EEOC v. W&O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000), the court held that "lack of ill will is not sufficient, in and of itself, to bar punitive damages." Hunter read this to support his argument about unconscious discrimination, but the facts of that case do not bear that out. There, the managers of a restaurant had a policy in place that limited the work opportunities of pregnant waitresses past their fifth month of pregnancy. *Id.* at 607. The Eleventh Circuit held that the fact that the managers had a benevolent motive to protect pregnant women could not protect them from being liable for punitive damages. *Id.* at 611. Contrary to Hunter's argument, it did not hold that they could be liable for punitive damages without even realizing they were treating pregnant employees differently.

Finally, Hunter directs us to Judge Kelly's concurrence in *United States v. Young*, 6 F.4th 804, 812 (8th Cir. 2021) (Kelly, J., concurring), where she said, "[I]n recent years, scientific and psychological research has discovered that, despite our conscious efforts to think and do otherwise, we may unconsciously hold on to biases that affect our perception, understanding, and decisionmaking." *Young*, however, was a federal criminal case, and the issue was whether the defendant was entitled to have the jury voir dired on implicit bias. *Id.* at 808–09 (majority opinion). The court held, unanimously, that he wasn't. *Id.* The issue of eliminating juror bias is a separate one from the standards for disability discrimination under the ICRA, and it is not especially helpful to borrow language from one line of cases and apply it to the other. In that regard, we note that the district court gave a separate instruction to the jurors on setting aside their own biases.[3]

"Prejudice occurs and reversal is required if jury instructions have misled the jury, or if the district court materially misstates the law." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015). Instruction No. 26 was the final liability instruction—i.e., the last instruction before the damage instructions—and it misstated the law and broadened the definition of discrimination such that the jury could have found for Hunter even if the City did not intentionally discriminate against Hunter.

Hunter, however, argues that collectively the jury instructions were not misleading or prejudicial. He points especially to the jury's special verdict finding

---

[3]This instruction appears prominently and in all-upper-case letters on the cover page of the jury instructions and verdict forms under the title, "Statement from the Iowa Supreme Court." We do not approve of that practice. This instruction is not actually a statement from our court but a model jury instruction crafted by the Iowa State Bar Association's Committee on Criminal Jury Instructions. Also, we have concerns about distinguishing one jury instruction from the rest by displaying it prominently on the cover page.

that the City failed to prove "it would have made the same decision to terminate Plaintiff's employment regardless of his disability." He argues that any potential error is "necessarily dispelled by" the jury's verdict rejecting the same-decision defense.

In *Hawkins v. Grinnell Regional Medical Center*, we endorsed the same-decision affirmative defense to accompany the motivating-factor test. We held that "under the ICRA an employer should be entitled to the same-decision affirmative defense because we have adopted the motivating-factor test for causation in ICRA discrimination cases." 929 N.W.2d at 272. Adhering to the framework established by the United States Supreme Court in *Price Waterhouse v. Hopkins*, we stated that "when an employee proves discrimination was a motivating factor in the employer's actions, the employer could avoid liability 'by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [or other protected characteristics] into account.'" *Id.* (alteration in original) (quoting *Price Waterhouse*, 490 U.S. at 258). In sum, in a discrimination case tried under the motivating-factor standard, "the defendant is entitled to an instruction on the same-decision defense recognized in *Price Waterhouse* if properly pled and proved." *Id.*

We are not persuaded that the same-decision defense in this case cured any prejudice resulting from the stereotypes instruction. At trial, the jury heard considerable evidence of Hunter's misconduct. It also heard considerable evidence that Hunter's misconduct could be attributed to his PTSD. For example, Dr. Grove testified that the relative lack of misconduct or problem drinking in Hunter's past, when compared with his actions on June 5–6, made it more likely that Hunter's PTSD caused the June 5–6 incident. Chief Wingert testified that

he felt it was still appropriate to terminate Hunter "even though his behavior [was] influenced and/or caused by his disability." The connection between Hunter's disability and his misconduct should not have been fatal to the City's defense. As we have already noted, "Although an employer is prohibited from discharging an employee based on a disability, an employer is not prohibited from discharging an employee based on misconduct, even if that misconduct is related to his disability." *Hoffman*, 739 F. App'x at 149.

But the same-decision defense here muddled that point. It asked simply whether the City would have made the same decision to terminate Hunter's employment "regardless of his disability." This language was subject to varying interpretations. Was the jury being asked to consider (1) a hypothetical Matthew Hunter who had engaged in the same misconduct but didn't have PTSD or (2) a hypothetical Matthew Hunter who didn't have PTSD and therefore didn't engage in whatever misconduct the jury attributed to the PTSD? Notably, Hunter's counsel steered the jury toward the second alternative. During closing argument, Hunter's counsel stated—incorrectly—that "[f]iring somebody for conduct that's caused by a disability is firing them because of the disability."[4]

---

[4]In rebuttal argument, Hunter's counsel acknowledged, himself, that the same-decision defense was a "little muddled" so he offered the following clarification:

> It came a little muddled, so I want to clarify that. You'll see it in the decision. The question is whether they proved not if they would have fired Matt [Hunter] if he didn't have PTSD, but if they still would have fired him considering his PTSD. That's the defense. I don't know if that came clear.

With respect, that clarification was also muddled. The defense should have been recognized if the City proved it would have fired Hunter even if he didn't have PTSD, not if the City proved it would have fired him after considering his PTSD.

Even in his appellate brief, Hunter continues to blur the same-decision-defense analysis. He maintains that the decision failed as a matter of law because "Defendant admits [Hunter's] conduct on June 5 was causally related to his disability and has never identified a reason independent of the conduct causally related to [Hunter's] disability." But the City didn't need a reason independent of the June 5–6 misconduct if it proved that it would have terminated Hunter for the June 5–6 misconduct without taking Hunter's disability into account.

Under our precedent, "the same-decision defense permits the employer to avoid liability if it proves by a preponderance of the evidence that it would have made the same decision *even if* it had not taken the protected characteristic into account." *Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 696 (Iowa 2022). That's the wording adopted by the Eighth Circuit's model jury instruction. Its ADA disparate-treatment same-decision instruction asks, "Has it been proved that the defendant would have (specify action taken with respect to the plaintiff) *even if the defendant had not considered* the plaintiff's (specify alleged impairment)?" Jud. Comm. on Model Jury Instructions for the Eighth Cir., Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, Instruction No. 9.01, at 9–16 (2025) (emphasis added) (footnote omitted), https://juryinstructions.ca8.uscourts.gov/instructions/civil/Civil-Jury-Instructions.pdf [https://perma.cc/J6JU-A6C6]. But the instruction here framed the question differently, asking whether the City would have terminated Hunter "regardless of his disability." That instruction collapsed the distinction between disability and disability-caused misconduct.

The City did not object to the way in which the same-decision defense was submitted, so it cannot be considered a basis for overturning the jury verdict in Hunter's favor. However, for the reasons we have explained, it does not *salvage* the jury verdict from the effects of the error perpetrated by Instruction No. 26. We agree with the court of appeals that a new trial is required on Hunter's disability-discrimination claim.

2. *The City's proposed instructions.* The City maintains that the district court erred in denying two of its proposed jury instructions. We agree with the court of appeals that these matters are likely to arise on retrial. *See Rumsey*,

962 N.W.2d at 33 (addressing an issue that would arise again on retrial). So we address them now.

First, the City contends the district court erred by rejecting the City's proposed "Rules of Conduct" instruction, which provided,

> When an employee violates an employer's rules of conduct, and was guilty of egregious behavior, the employer is within its rights to terminate the employee for such behavior.

Second, the City argues the district court should have given its proposed instruction on comparator evidence. That instruction stated in relevant part:

> Plaintiff's claim asserts that other employees, who are not disabled, are comparators to him and demonstrate the Defendant's differential treatment of him. In considering whether a fellow employee is a comparator, you should consider the following:
>
> . . . .
>
> The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.

A district court must give a proposed jury instruction when it "correctly states the law, has application to the case, and is not stated elsewhere in the instructions." *DeBoom*, 772 N.W.2d at 5 (quoting *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 539 (Iowa 1996)).

We agree with the court of appeals that the district court did not err in refusing to give the rules-of-conduct instruction. As we have already discussed, an employer can terminate an employee for misconduct, so long as the employee's disability was not a motivating factor or—if it was—the employer demonstrates that it would have made the same decision without taking the disability into account. The marshaling instruction and the same-decision instruction together are designed to capture those points of law. Additionally, in this case, a "business judgment" instruction admonished the jury not to "return

a verdict for [Hunter] just because you might disagree with the [City's] decision or believe it to be harsh or unreasonable." Given these instructions, the City's rules-of-conduct instruction would be repetitive and might unduly emphasize the City's theory of defense.

As for the City's comparator instruction, we agree with the court of appeals that it was too restrictive. Requiring comparators to have engaged in "the same conduct without any mitigating or distinguishing circumstances" is unattainable and unrealistic. We indicated in *Feeback* that the plaintiff may point to "other employees whose violations were of *comparable seriousness*." 988 N.W.2d at 350 (quoting *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013)).

The remaining issues raised by the City may not arise on remand—or may not arise in the same form—so we do not address them. *See Rumsey*, 962 N.W.2d at 33.

**V. Conclusion.**

For the foregoing reasons, we affirm the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial on the disability-discrimination claim.

**Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**